FRIEDLAND ET AL., APPELLANTS, *v.*
LIPMAN ET AL., APPELLEES.

(No. 41256 — Decided June 12, 1980.)

*Mr. James M. Mackey,* for appellants.
*Wyner & Wyner Co., L.P.A.,* and *Mr. Edward D. Wyner,* for appellees.

SILBERT, J.   Plaintiffs-appellants, J. Edward Friedland and Carolyn B. Friedland, appeal from an order of the court below granting defendants-appellees', William Lipman and Gertrude Lipman, motion for partial summary judgment and, accordingly, entering judgment for appellees on the first claim within appellants' complaint.

The record below reveals the following facts as established by admissions within the pleadings and by documentary evidence attached to both appellees' motion for partial summary judgment and appellants' brief in opposition.

Prior to July 19, 1976, appellees owned an undivided, one-half interest in a 32-suite apartment building, located at 15700 Van Aken Boulevard, Shaker Heights, Ohio.[1] In July and August of the preceding year, appellees had submitted two claims to their insurer, National Fire Insurance Company, involving roof damage to this apartment building. On these claims, appellees received $15,000 from their insurer. In 1974 and in 1975, appellees received estimates from at least two roofers recommending that the entire roof of the building be replaced. One of the roofers indicated in its estimate that the

[1] The remaining undivided, one-half interest was owned by South Shaker Apartments, Inc., against whom appellants have a claim still pending in the court below. See fn. 2, *infra,* with respect to Civ. R. 54(B).

total cost of the project would be between $5,000 and $6,000.

In October of 1975, appellees hired Friedman Roofing to *repair* the existing roof. Friedman repaired and recoated the roof itself and repaired leaks in valleys on the roof. The record does not indicate how much Friedman was paid by appellees for this work.

In April of 1976, Friedman was hired by appellees to do more extensive repairs to the roof and building. Breaks in the roof were repaired; a coating of asphalt was applied; gutters, downspouts, roof valleys, and dormer decks were also repaired; slates were replaced; brick joints were pointed and filled; windowsills, spindles and railings were rebuilt; and the railings were siliconed and Thorosealed. Friedman was paid $2,500 by appellees for this work.

In February of 1976, prior to Friedman's second repair job, appellees and South Shaker Apartments, Inc. (the owner of the other undivided, one-half interest), entered into *negotiations* with appellants for the sale of their apartment building. Among other things, appellants sought from the owners a two-year warranty on the building's roof. Appellees resisted giving such a warranty. Appellees assured appellants, on several occasions, that the roof was in excellent condition and that much money had recently been spent on it.

In reliance upon these assurances, and after talking with Ted Friedman, of Friedman Roofing, and Lenny Himmel, appellees' real estate broker, and, as well, visually inspecting the roof, appellants dropped their demand for a roof warranty and, on July 19, 1976, signed a contract for the purchase of the apartment building. Some two weeks later, title was transferred to appellants.

At about this same time, appellants discovered several problems with their just-purchased building. They found a water-damaged basement suite. They also found that appellees had removed certain tools and phone equipment which had been purchased with the building. Finally, they determined that appellees, who leased a suite in the building, had an air-conditioning system which used a substantial amount of water.

In an effort to resolve these problems, appellants met, on August 1, 1976, with appellees' attorney. An understanding was reached. On August 3, 1976, appellants sent a letter to appellees' attorney confirming this understanding that, in ex-

change for appellees giving appellants $1,150 and paying the utility charges associated with the air-conditioning system, appellants would repair the basement suite, relinquish their claim to the tools and phone equipment, and allow appellees to continue using the air-conditioning system within their suite. Thereafter, on August 31, 1976, appellants signed an agreement to this effect, but one which also contained, *inter alia,* the following paragraphs:

"1. Purchasers now agree that they have inspected every single aspect of the property at 15700 Van Aken Boulevard, Shaker Heights, Ohio from and including the roof of the property down through the entire property into the basement of the property where they have examined all heating systems, plumbing systems, electrical systems, sewage systems, apartments that had been damaged by water, all other apartments, and all of the grounds of said property and admit that they are fully and completely aware of every condition of the property and that they agree to accept said property in its present condition as is and that no representation, warranties, or agreements have been made in connection therewith except as is stated herein either by the Sellers or anyone acting in Sellers' behalf.

"  *  *  *

"6. Upon faithful performance by the Sellers of the conditions contained in this Agreement, the Purchasers do hereby release, discharge, the said Sellers from any claims that said Purchasers now have or may hereafter have against said Sellers resulting from an Agreement dated July 19, 1976 for the purchase and sell [*sic*] of the property at 15700 Van Aken Boulevard, Shaker Heights, Ohio."

Appellants were paid $1,000 by appellees pursuant to the terms of this agreement. Appellees themselves neither signed this agreement nor ever saw it. Instead, one Ralph Appelbaum, without power of attorney, signed it on their behalf.

Three or four months after signing this release agreement, appellants learned from some of their tenants that the building's roof had been leaking water into apartment suites since 1975. Appellants' claim to their insurer in April of 1977 for roof damage was denied on the basis of a roofer's report advising the insurer that the building's previous owner had

been informed in 1975 that the entire roof needed to be replaced.

In October of 1977, appellants filed their complaint below against appellees for compensatory and punitive damages, alleging fraud in the sale of the apartment building, arising out of appellees' alleged misrepresentations concerning the condition of the roof. In their answer, appellees, *inter alia,* raised, in the form of an affirmative defense, the release contained within paragraph No. 6 of the August 31, 1976 agreement between the parties.

On July 24, 1979, the lower court granted appellees summary judgment on the first claim within appellants' complaint.[2] In timely appealing from this judgment, appellants assign the following single error:

"The trial court erred prejudicially to appellants in its decision and order of July 24, 1979, in the following respects:

"Trial court erred as a matter of law in granting appellees' motion for partial summary judgment."

In arguing this assignment of error, appellants raise two issues:

"1. Whether exculpatory language and/or a release executed prior to the discovery of fraudulent acts of a vendor will relieve a vendor from responsibility for damages sustained by vendee arising out of the fraudulent conduct of the vendor?

"2. Whether a partial summary judgment can be granted when there is a genuine issue of fact before the court?"

In order to sustain the judgment below, we must be able to conclude, as a matter of law, from the evidence considered by the lower court in granting appellees' motion, that either appellants released their fraud claim against appellees by virtue of the agreement signed on August 31, 1976, or appellants failed to either create a genuine issue of material fact or establish the existence of all of the necessary elements of an action in fraud. Upon reviewing all of the evidence in a light most favorable to appellants and considering the arguments of the parties, we determine that the judgment of the court below is contrary to law and must be reversed.

We turn first to the issue of release. If the lower court

---

[2] This order was determined by the lower court to be a final judgment pursuant to Civ. R. 54(B).

granted appellees summary judgment upon this dispositive affirmative defense, the court erred. Even assuming that no genuine issue of material fact existed with respect to whether the parties executed the agreement of August 31, 1976, a copy of which was attached to appellees' motion for summary judgment below, it is clear that a genuine issue existed as to whether the parties intended to release the claim which appellants brought in the lower court. While the release provisions of the August 31, 1976 agreement before us employ broad language, we cannot say, as a matter of law, that the agreement encompasses appellants' fraud claim. Whether the parties to a release intended to discharge, *inter alia,* liability arising from claims in fraud, the existence of which one party typically will have been ignorant, is a question of fact to be resolved at trial. See *Sloan* v. *Standard Oil Co.* (1964), 177 Ohio St. 149, paragraph two of the syllabus. Therefore, even assuming the existence of a validly executed release, a genuine issue of material fact remained as to whether the parties to the release intended to discharge appellees from liability on the claim brought by appellants below.

We turn next and finally to the issue of whether the evidence below, when viewed in a light most favorable to appellants, established as a matter of law, that no genuine issue of material fact existed as to one or more of the necessary elements of a fraud action and whether the undisputed nonexistence of any such elements, as a result, entitled appellees to summary judgment on the first claim within appellants' complaint.

The elements of a common law action of fraud are stated in *Klott* v. *Associates Real Estate* (1974), 41 Ohio App. 2d 118, 120-21, as follows:

"* * * actual or implied representations or concealment of a matter of fact which relates to the present or past, and which is material to the transaction; made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; with the intent of misleading another into relying upon it; and reliance upon it by the other person with a right to so rely; with resulting injury as the consequence of such reliance."

Appellant J. Edward Friedland's affidavit contains statements creating a genuine issue of material fact on the

elements of a representation of fact and its materiality to the transaction. Friedland therein stated that, on at least three occasions prior to executing the July 19, 1976 purchase contract, appellee William Lipman represented to him that the building's roof was in "excellent condition" and that much money had been spent on it. Friedland further stated that the condition of the roof was a material concern of his prior to agreeing to purchase the building.

Exhibits Nos. 5 and 8, attached to appellants' brief in opposition to the motion for summary judgment, were letters from roofers advising that appellees had been put on notice during the year prior to the sale of the building that the entire roof needed replacement.[3] This evidence created a genuine issue of material fact as to whether appellees had knowledge of the alleged falsity of their representations to appellants that the roof was in "excellent condition". This evidence, together with evidence that appellees, during the negotiations leading up to the sale of the building, hired a roofer to make extensive repairs to the roof, created a genuine issue of material fact as to whether appellees further intended to allegedly mislead appellants.

J. Edward Friedland's affidavit next created a genuine issue of material fact as to whether appellants justifiably relied on appellees' alleged misrepresentations regarding the roof's condition. Therein, Friedland stated that he spoke with both roofer Friedman, who indicated that work had been done on the roof, and appellees' broker, Lenny Himmel, who related to Friedland that appellees had told him (Himmel) that the roof was in fine condition.[4] Appellant Friedland further stated that he visually inspected the roof itself, but, because he was not a roofing expert and the defect itself was hidden, his suspicions were not further aroused. These statements created an issue of fact both as to whether appellants relied on appellees' alleged misrepresentations and whether such reliance was justifiable.

Finally, J. Edward Friedland's affidavit and Exhibit No.

---

[3] The copies of these letters, attached to appellants' brief, constituted hearsay evidence and, further, failed to comply with Civ. R. 56(C) and (E). However, no objection to their admission was made by appellees below and, in the absence thereof, we must presume that the lower court considered this evidence in arriving at its decision.

[4] Unobjected to hearsay. See fn. 3, *supra.*

7, which was attached to the brief in opposition to the motion for summary judgment and which was an estimate appellants received from National Cornice Company,[5] created a genuine issue of material fact as to whether, and in what amount, appellants were damaged by appellees' alleged misrepresentations.

Having neither, as a matter of law, concluded that appellants were barred from initiating their fraud claim against appellees by a release nor that appellees were otherwise, at the summary judgment juncture, entitled to judgment on appellants' claim, we find appellants' sole assignment of error well taken. The judgment of the court below is reversed and the cause remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

PATTON, P. J., and PARRINO, J., concur.

SILBERT, J., retired, of the Eighth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.

---

[5] Unobjected to hearsay. See fn. 3, *supra.*