WILLIAMS, APPELLEE, *v.* AETNA FINANCE COMPANY, D.B.A. ITT FINANCIAL SERVICES, APPELLANT.

[Cite as *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464.]

(No. 97–1670—Submitted May 26, 1998—Decided November 4, 1998.)

468

*William H. Blessing,* for appellee.

*Dinsmore & Shohl, Mark A. Vander Laan, M. Gabrielle Hils, Jeffrey R. Schaefer* and *Anthony J. Celebrezze, Jr.,* for appellant.

*Dreher, Langer & Tomkies, L.L.P., Darrell L. Dreher* and *Jeffrey D. Quayle,* urging reversal for *amici curiae,* Ohio Consumer Finance Association and Ohio Bankers Association.

ALICE ROBIE RESNICK, J.   This appeal presents four principal issues for our review:  (1) whether the trial court properly denied ITT's motion to compel arbitration;  (2) the propriety of the grounds for Williams's recovery against ITT, under a theory of civil conspiracy, upheld by the court of appeals;  (3) whether ITT was found derivatively liable for punitive damages based on a third party's violations of the CSPA and HSSA;  and (4) whether punitive damages were improperly assessed, and whether the amount of punitive damages awarded is so excessive that a due process violation occurred.   For the following reasons, ·after

a comprehensive review of the record, we affirm the judgment of the court of appeals on each issue.

## I

### Arbitration

ITT argues in its fourth proposition of law that the broad arbitration provision in the loan agreement for the home equity loan Williams signed with ITT should have been enforced, and that this case should never have proceeded to trial. Furthermore, ITT takes issue with the court of appeals' determination that ITT was not "materially prejudiced" by the trial court's refusal to compel arbitration. The court of appeals found no prejudice, stating that ITT got the "real thing" (a trial) and also that "[a]rbitration is merely a substitute for litigation."

ITT cites a long line of Ohio and federal cases, including cases decided by this court and by the United States Supreme Court, to support its arguments regarding a strong policy in favor of enforcement of arbitration clauses in written agreements. See, *e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967), 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270; *Allied–Bruce Terminix Cos., Inc. v. Dobson* (1995), 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753.

We agree with ITT that this court's precedents do indicate that arbitration is encouraged as a method to settle disputes. See, *e.g.*, *ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 692 N.E.2d 574; *Council of Smaller Enterprises v. Gates, McDonald & Co.* (1998), 80 Ohio St.3d 661, 687 N.E.2d 1352; *Schaefer v. Allstate Ins. Co.* (1992), 63 Ohio St.3d 708, 711–712, 590 N.E.2d 1242, 1245. A presumption favoring arbitration arises when the claim in dispute falls within the scope of the arbitration provision. An arbitration clause in a contract is generally viewed as an expression that the parties agree to arbitrate disagreements within the scope of the arbitration clause, and, with limited exceptions, an arbitration clause is to be upheld just as any other provision in a contract should be respected. See *Council of Smaller Enterprises*, 80 Ohio St.3d at 668, 687 N.E.2d at 1357.

R.C. 2711.01(A) provides that a provision in a written contract such as is at issue in the present case "to settle by arbitration a controversy that subsequently arises out of the contract, or out of the refusal to perform the whole or any part of the contract * * * shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract."

We have carefully examined the record, and we acknowledge, as the court of appeals did, that nowhere in the record did the trial court make a specific determination that the arbitration clause was unenforceable on equitable grounds, such as unconscionability. The trial court merely found the arbitration clause

invalid, but gave no reason for the finding of invalidity. The record reveals that, given the procedural history of this case on the arbitration issue, the trial court may have been somewhat confused on what effect the resolution of the appeal on that issue by the court of appeals (left untouched by this court's decision to dismiss the further appeal) had on subsequent proceedings on remand.

This court's precedents, as well as the directives of the United States Supreme Court, call into question some of the conclusions reached by the court of appeals regarding the enforceability of the arbitration provision at issue. Nevertheless, while not necessarily agreeing with all of the statements made by the court of appeals in support of its ultimate conclusion upholding the ruling of the trial court regarding arbitration, we do agree with that ultimate conclusion on this issue.

The record in this case clearly would support a finding that the arbitration clause violated principles of equity, given all of the attendant facts and circumstances. Williams filed an affidavit in the trial court regarding the arbitration clause's inclusion in the loan agreement, to support her challenge to the specific validity of the arbitration clause. After taking into account both the procedural and substantive progress of this case, we find that the complete record compels the conclusion that the trial court, while not specifically declaring the arbitration agreement to be invalid (*i.e.*, because the arbitration clause itself was unconscionable), did in essence make that determination.

The trial court was entitled initially to view the arbitration clause at issue with some skepticism. In the situation presented here, the arbitration clause, contained in a consumer credit agreement with some aspects of an adhesion contract, necessarily engenders more reservations than an arbitration clause in a different setting, such as in a collective bargaining agreement, a commercial contract between two businesses, or a brokerage agreement. See, generally, 1 Domke on Commercial Arbitration (Rev.Ed.1997) 17–18, Section 5.09. When the further complete situation of this case is taken into account, *i.e.*, Williams's evidence regarding the conspiracy between ITT and Blair as the fundamental reason for her entering into the loan agreement in the first place, and also the questionable conditions under which the dispute would be submitted to arbitration as revealed in the record, there is further support for the invalidity of the arbitration clause.

A virtually identical arbitration clause was challenged as unenforceable in *Patterson v. ITT Consumer Fin. Corp.* (Cal.App.1993), 14 Cal.App.4th 1659, 18 Cal.Rptr.2d 563. In *Patterson* the court considered whether the loan agreement was an adhesion contract on facts virtually the same in all relevant respects to the loan agreement at issue in the case *sub judice*, and determined that it was "indisputable that the contract was one of adhesion." 14 Cal.App.4th at 1664, 18 Cal.Rptr.2d at 566.

The court examined the one-sided rules establishing the prerequisites to achieving an arbitration hearing, and also considered that a consumer was required by the rules to prepay a substantial amount of fees as a condition precedent ·to arbitration. The court concluded, "The likely effect of these procedures is to deny a borrower against whom a claim has been brought any opportunity to a hearing, much less a hearing held where the contract was signed, unless the borrower has considerable legal expertise or the money to hire a lawyer and/or prepay substantial hearing fees. * * * In a dispute over a loan of $2,000 it would scarcely make sense to spend a minimum of $850 just to obtain a participatory hearing." *Id.* at 1666, 18 Cal.Rptr.2d at 566.

The *Patterson* court held that this arbitration provision was unconscionable, and thus unenforceable: "The contractual risk of a dispute resolution process which is weighted heavily against the borrower being able to obtain a hearing seems particularly unreasonable in light of the much greater bargaining power of ITT and its reluctance to disclose even the mechanics of [the] arbitration until it makes an arbitration claim." *Id.* at 1666, 18 Cal.Rptr.2d at 567.

The parallels between the *Patterson* case and the case before us are striking. *Patterson* involved small consumer loans made by ITT on preprinted forms similar to the form signed by Williams, with a virtually identically worded arbitration clause. Consequently, based on the specific circumstances present here, we determine that the trial court's decision denying ITT's motion to compel arbitration was tantamount to a finding that the agreement to arbitrate was invalid, and further that the arbitration provision was unconscionable. We determine that any presumption in favor of arbitration was overcome based on the entire record of this case. Furthermore, we believe that the presumption in favor of arbitration should be substantially weaker in a case such as this, when there are strong indications that the contract at issue is an adhesion contract, and the arbitration clause itself appears to be adhesive in nature. In this situation, there arises considerable doubt that any true agreement ever existed to submit disputes to arbitration.

We recognize that the failure of the trial court to make a specific determination of unconscionability on the record made ITT's appeal more difficult to frame. However, we determine that this case properly proceeded to trial, and we find no merit in ITT's fourth proposition of law.

## II

### Civil Conspiracy

At the court of appeals, ITT challenged the theories of recovery relied upon by Williams at trial. The court of appeals sustained ITT's arguments in part, finding that Blair was not acting as an agent of ITT, as a matter of law, when he

induced Williams to contract with him to do the improvements on her home. We agree with the court of appeals that no agency relationship between Blair and ITT was shown. However, while finding that the jury's verdict could not be sustained on agency grounds, the court of appeals further upheld the jury verdict against ITT based on Williams's additional claim that ITT participated in a civil conspiracy against her. The jury, in its answer to interrogatory number one, specifically found that ITT participated in a conspiracy that damaged Williams.

In upholding the jury's verdict against ITT, the court of appeals determined that ITT violated a duty to disclose (arising in the "special circumstances" of this case) to Williams based on ITT's knowledge of the fraudulent activities of Blair, as asserted by Williams at trial. The court of appeals held that this fraudulent concealment of material information by ITT was ITT's contribution to the civil conspiracy perpetrated by Blair and ITT on Williams, and that this concealment justified the jury's verdict against ITT.

In its first proposition of law, ITT takes issue with the court of appeals' determination that a duty to disclose owed to Williams, based on special circumstances, was violated by ITT. ITT urges that the relationship of a borrower to a lending institution is not a fiduciary relationship, that there is no duty to speak, and that the "special circumstances" exception to this rule adopted by the court of appeals is "so vague and standardless as to be unworkable." See, e.g., *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363, paragraph two of the syllabus ("A creditor and consumer stand at arm's length in negotiating the terms and conditions of a consumer loan and, absent an understanding by both parties that a special trust and confidence has been reposed in the creditor, the creditor has no duty to disclose to the consumer the existence and details" regarding aspects of the transaction.); *Ed Schory & Sons, Inc. v. Francis* (1996), 75 Ohio St.3d 433, 442, 662 N.E.2d 1074, 1081 (a fiduciary relationship between a debtor and a creditor may be created out of an informal relationship only when both parties understand the existence of a special trust or confidence).

We do not view this case the same way the court of appeals did. Although we affirm the judgment of the court of appeals that, on the facts of this case, the jury verdict against ITT can be upheld for ITT's role in a civil conspiracy with Blair against Williams, we disagree with the reliance by the court of appeals on the "special circumstances" exception to the general rule of no duty to disclose.

Consequently, we disagree with the analysis of the court of appeals. Because our analysis differs from that of the court of appeals, we do not approach the resolution of ITT's first proposition of law in the manner the issue is presented by ITT, but instead explain why ITT's contentions regarding a duty to disclose are not relevant to our consideration.

The tort of civil conspiracy is " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866, quoting *LeFort v. Century 21– Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645; *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 219, 687 N.E.2d 481, 496; *Minarik v. Nagy* (1963), 8 Ohio App.2d 194, 196, 93 Ohio Law Abs. 166, 168, 26 O.O.2d 359, 360, 193 N.E.2d 280, 281. See 16 American Jurisprudence 2d (1998), Conspiracy, Sections 50–73. For a thorough analysis of the elements of civil conspiracy and an explanation of how the tort subtly differs from the related aiding and abetting theory of liability, see, generally, *Halberstam v. Welch* (C.A.D.C.1983), 705 F.2d 472.

An underlying unlawful act is required before a civil conspiracy claim can succeed. *Gosden,* 116 Ohio App.3d at 219, 687 N.E.2d at 496; *Minarik,* 8 Ohio App.2d at 195, 93 Ohio Law Abs. at 168, 26 O.O.2d at 360, 193 N.E.2d at 281. The malice involved in the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 11 O.O.2d 199, 200, 166 N.E.2d 227, 229; *Gosden,* 116 Ohio App.3d at 219, 687 N.E.2d at 496.

Fraud is

" '(a) a representation or, where there is a duty to disclose, concealment of a fact,

" '(b) which is material to the transaction at hand,

" '(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

" '(d) with the intent of misleading another into relying upon it,

" '(e) justifiable reliance upon the representation or concealment, and

" '(f) a resulting injury proximately caused by the reliance.' " *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 169, 10 OBR 500, 502, 462 N.E.2d 407, 409, quoting *Friedland v. Lipman* (1980), 68 Ohio App.2d 255, 22 O.O.3d 422, 429 N.E.2d 456, paragraph one of the syllabus. See, also, *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus; *Russ v. TRW, Inc.* (1991), 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083.

The court of appeals found that there was no testimony in the record that would justify a finding that any ITT representative misrepresented a fact material to the loan agreement to Williams, and so proceeded to consider whether ITT representatives had concealed a material fact from Williams under element (a) of *Cohen* set out above. The court of appeals based its reasoning upon the

consideration that, although Blair referred Williams to ITT, ITT did an independent evaluation of her creditworthiness before issuing her the loan.

We disagree with this specific part of the court of appeals' analysis. If ITT and Blair did engage in a conspiracy to defraud Williams, as Williams alleged, then, as a consequence of the existence of the conspiracy, the finding could be upheld that ITT representatives engaged in fraud against Williams. In a conspiracy, the acts of coconspirators are attributable to each other. See Prosser & Keeton on Torts (5 Ed.1984) 323, Section 46 ("All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's act done for their benefit, are equally liable." [Footnotes omitted.] ).

After a comprehensive review of the record, we determine that the jury reasonably determined on the sum total of the evidence presented that employees of ITT conspired with Blair to defraud Williams, with resulting damages to her. ITT can be held liable for the intentional torts of its employee loan officers committed within the scope of their employment. Osborne v. Lyles (1992), 63 Ohio St.3d 326, 329, 587 N.E.2d 825, 828–829; Byrd v. Faber (1991), 57 Ohio St.3d 56, 58, 565 N.E.2d 584, 587. ITT's role in the conspiracy was to allow Blair to have access to loan money that was necessary to further his fraudulent actions against customers such as Williams. Thus, ITT employees themselves affirmatively committed fraud by the very acts of making the loans to Williams and others.

In particular, the testimony of former ITT branch manager and regional manager Jeffrey Stires supported Williams's claims that ITT employees conspired with Blair. Stires testified that Blair's financial problems were well known among ITT employees for a significant time before the loan was made to Williams, and that the term "Blair loan" had developed a specific, highly negative connotation among employees of ITT. In addition, Stires and others testified to the close relationship between Blair and ITT's employees.

Because we find that the record provides ample support for the jury's verdict, we disagree with the court of appeals' discussion regarding ITT's violation of a duty to disclose relevant information to Williams. The imposition of liability on ITT on a civil conspiracy theory of recovery is sustainable without a need to rely on the analysis set forth by the court of appeals. We therefore do not address the specific arguments made by ITT and amici curiae on the ramifications of the court of appeals' holding on the disclosure issue, and sustain the jury's verdict that ITT and Blair conspired to commit a fraud that damaged Williams.

## III

### Punitive Damages

ITT challenges the award of punitive damages against it on several fronts. ITT claims that it should not be derivatively liable for punitive damages based on Blair's violations of the CSPA and HSAA. ITT also argues that punitive damages should never have been awarded based on any of the other theories presented at trial, or based on a violation of the duty to disclose which the court of appeals relied on in upholding compensatory damages based on civil conspiracy. Furthermore, ITT argues that the amount of punitive damages awarded was grossly excessive.

### A. CSPA/HSSA liability as support for punitive damages

In the trial court and in the court of appeals, ITT argued that, because it is a dealer in intangibles, its loan contract with Williams was not a "consumer transaction" per R.C. 1345.01, so that the CSPA, R.C. 1345.01 *et seq.*, did not apply to it. See, also, R.C. 5725.01. ITT also argued that the HSSA, R.C. 1345.21 *et seq.*, did not apply. Williams opposed ITT's claims in this regard by arguing that ITT did more than merely make an arm's-length loan to Williams. Williams contended that ITT was sufficiently intertwined with Blair in dealing with Williams that ITT, by virtue of its relationship with Blair, could be found liable under the CSPA and HSSA.

The court of appeals found no need to address ITT's arguments on the grounds raised by ITT, determining that due to the Federal Trade Commission's "holder rule" set forth in Section 433.2(a), Title 16, C.F.R., Williams could sue ITT derivatively for Blair's violations of the CSPA and HSSA. In this situation, ITT is being held accountable not as a financial institution, but instead as a holder of a consumer credit contract. See *Milchen v. Bob Morris Pontiac–GMC Truck* (1996), 113 Ohio App.3d 190, 195, 680 N.E.2d 698, 701–702 (because the consumer is blameless when the seller fails to deliver the promised performance of goods or services purchased on credit, the Federal Trade Commission believed it was equitable to reallocate the cost of seller misconduct from the debtor to the creditor); *Ambre v. Joe Madden Ford* (N.D.Ill.1995), 881 F.Supp. 1182, 1184–1185.

The document signed by Williams to acquire the loan from ITT included the following language, pursuant to Section 433.2(a), Title 16, C.F.R.:

### "NOTICE

"ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD

ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER."

As we understand ITT's third proposition of law, ITT no longer argues that it was improperly subjected to liability under the CSPA and HSSA. ITT now argues that it could not be found derivatively liable for *punitive damages* based on the CSPA and HSSA, but at most could be found liable only for Williams's actual damages caused by Blair, with those damages limited to an absolute maximum of the "amounts paid by the debtor" thereunder – the $11,500 Williams paid to Blair for the work never completed. ITT contends that the court of appeals was mistaken in utilizing the "FTC holder rule" to sustain the punitive damages award. In support, ITT cites *Hardeman v. Wheels, Inc.* (1988), 56 Ohio App.3d 142, 565 N.E.2d 849, in which the court found that, because liability imposed derivatively against a lender under the FTC holder rule is not based on the lender's own misconduct, and because punitive damages are assessed to punish conscious wrongdoing, an award of treble damages under R.C. 1345.09 against a culpable party may not be imposed derivatively under Section 433.2, Title 16, C.F.R.

We disagree with ITT's interpretation that the court of appeals sustained the punitive damages award based on ITT's derivative liability under the CSPA and HSSA. Rather, our reading of the court of appeals' opinion convinces us that the court of appeals sustained the punitive damages award based on a civil conspiracy between Blair and ITT to defraud Williams. We concur in the determination of the court of appeals that the award is sustainable on that basis, and therefore, we find no merit in ITT's third proposition of law.

## B. Other support for punitive damages award

As one part of its second proposition of law, ITT argues that it is unfair to subject it to liability for punitive damages when the court of appeals upheld the punitive damages based upon ITT's violation of a duty to disclose that was only first recognized in the court of appeals' opinion. The further argument made by ITT is that ITT should not have been found liable for punitive damages on a theory of liability never submitted to the jury. As we have explained above, we disagree with the court of appeals' conclusion that ITT's violation of a duty to disclose was the basis for upholding liability against ITT for civil conspiracy. Therefore, we determine that ITT was not found liable for punitive damages based on the violation of an unanticipated duty to disclose, and that ITT was found liable based on a theory submitted to the jury. We do not further address ITT's argument in this regard.

ITT also challenges the award of punitive damages by reiterating one of its earlier arguments opposing the imposition of liability for compensatory damages in this case, which is that the case went to the jury primarily on Williams's claim that Blair was an agent of ITT, so that the jury awarded punitive damages against ITT primarily for actions attributable solely to Blair. As explained above, we agree with the court of appeals' ultimate conclusion that, even though Blair was not ITT's agent, the jury's finding that ITT was liable for compensatory damages should be upheld due to ITT's role in a civil conspiracy against Blair. For the same reasons that compensatory damages are supportable against ITT, punitive damages are also supported.

## C.   Excessiveness of punitive damages award

As another component of its second proposition of law, ITT, citing *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, contends that the punitive damage award of $1.5 million is grossly excessive. In *BMW*, the United States Supreme Court found that a $2 million punitive damages award was sufficiently excessive under the facts of that case that the award violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

In *BMW*, the court followed three guideposts, or indicia, of excessiveness to evaluate whether the punitive damages award violated due process. The three indicia are (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm to the plaintiff and the amount of the punitive damages, and (3) the difference between the amount of punitive damages awarded and the civil or criminal sanctions available to be imposed for similar misconduct. See 517 U.S. at 574–575, 116 S.Ct. at 1598–1599, 134 L.Ed.2d at 826.

We observe that the court in *BMW* appeared to tailor its decision very much to the specific facts of that case, with the three guideposts followed because they lent themselves well to the facts at hand. The court appeared to reject a categorical approach, with the result that the list of guideposts probably is not exhaustive, so that other factors likely will be relevant in the appropriate case. Furthermore, it would appear that when one of the guideposts is particularly relevant, a lesser reliance on the other guideposts may be justified. We question whether most defendants who challenge punitive damages based on the indicia discussed in *BMW* will be successful, given the statement in the concurring opinion in *BMW* to the effect that that justice viewed *BMW* as an "unusual case" in which the facts justified a conclusion that the punitive damages violated due process sufficient to overcome the "strong presumption of validity" attaching when a punitive damages award is not suspect on other grounds. *BMW*, 517 U.S.

at 597, 116 S.Ct. at 1609, 134 L.Ed.2d at 840 (Breyer, J., joined by O'Connor and Souter, JJ., concurring).

The court of appeals below analyzed the punitive damages award under the *BMW* guideposts, found that the amount awarded was not so excessive as to violate due process, and deferred to the judgment of the jury.

We generally agree with the court of appeals' consideration of the *BMW* factors here, and we likewise determine that the punitive damages awarded did not violate due process. We observe that there is ample evidence in the record that ITT engaged in wrongful conduct sufficient to merit an award of punitive damages. Furthermore, as the jury's responses to the interrogatories (along with the size of the punitive damages award) conclusively indicate, the jury accepted Williams's position on the key questions of fact, and rejected ITT's position. Thus, we must agree with the court of appeals that the jury's verdict is entitled to deference. Because the jury found ITT's conduct to be sufficiently reprehensible, consideration of the first guidepost of *BMW* yields the conclusion that due process was not violated in this case. Likewise, consideration of the other two guideposts also results in the conclusion that due process was not violated.

"The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331, 343; see, also, *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. The amount of punitive damages awarded may be excessive when it is determined to have been the product of passion and prejudice. See *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 39, 543 N.E.2d 464, 468. If the punitive damages award is not the result of passion and prejudice, and not the result of legal error, it is generally not within the province of a reviewing court to substitute its view for that of the jury. See *id.* at 40, 543 N.E.2d at 469. See, also, *id.* at 43–44, 543 N.E.2d at 471–472 (H. Brown, J., concurring). Since the punitive damages awarded in this case were not the result of passion and prejudice, and not the result of legal error, we uphold the jury's punitive damage award.

IV

Conclusion

In conclusion, we find that this case properly proceeded to trial, that ITT was properly found liable for its part in an alleged civil conspiracy against Williams, and that the amount of punitive damages awarded is not so excessive as to violate

due process based on all the facts and circumstances in the record.  The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., and COOK, J., concur in part and dissent in part.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

---

**COOK, J., concurring in part and dissenting in part.**  I agree with the majority that Williams minimally supported her civil conspiracy claim at trial and that the jury's finding of liability against ITT on that issue should stand.  Based on the state of the record in this case, however, I cannot agree with the majority on the arbitration issue or with its analysis of the punitive damages issue.

### Arbitration

I respectfully disagree with the majority's conclusion regarding the conscionability of the arbitration clause.  Until today's decision, no court has found the arbitration clause between ITT and Williams to be unconscionable.  As acknowledged by both the majority and the appellate court in this case, the trial court *never* resolved the issue of whether the arbitration clause was valid, much less whether the arbitration clause was unconscionable.  The reason for the lack of such a finding is that the parties never litigated this issue due to the odd procedural history of this case.  The plaintiff never sought to prove the arbitration clause unconscionable; she thought she had prevailed on that issue.

Much of the majority's unconscionability analysis focuses on analogies between this case and *Patterson v. ITT Consumer Fin. Corp.* (Cal.App.1993), 14 Cal. App.4th 1659, 18 Cal.Rptr.2d 563—a case where a California appellate court found a similar agreement to arbitrate disputes between a plaintiff and ITT before the National Arbitration Forum ("NAF") unconscionable.  There are several reasons, however, to distinguish *Patterson* and enforce the arbitration provision in this case.

As evidenced by R.C. Chapter 2711, there exists a strong legislative policy in Ohio favoring arbitration.  The same policy preference is stated in federal arbitration laws, which were specifically incorporated into the contract between Williams and ITT by reference.  Section 2, Title 9, U.S.Code. Furthermore, the General Assembly has done nothing to limit that policy preference to commercial transactions.  See R.C. Chapters 1321, 1322, 1345 and 1349.

Though state and federal legislation favors enforcement of agreements to arbitrate, both R.C. 2711.01(A) and Section 2, Title 9, U.S.Code permit a court to invalidate an arbitration agreement on equitable or legal grounds that would cause any agreement to be revocable. One such ground is unconscionability. " 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' *Williams v. Walker– Thomas Furniture Co.* (C.A.D.C.1965), 350 F.2d 445, 449." *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 383, 613 N.E.2d 183, 189. Accordingly, unconscionability has two prongs: a procedural prong, dealing with the parties' relation and the making of the contract, and a substantive prong, dealing with the terms of the contract itself. Both prongs must be met to invalidate an arbitration provision.

In explaining the analogies between this case and *Patterson*, the majority appears to stress the disparity of bargaining power between the parties and arbitration costs as reasons for nullifying the agreement to arbitrate as unconscionable. These factors, however, if by themselves deemed to render arbitration provisions of a contract unconscionable, could potentially invalidate a large percentage of arbitration agreements in consumer transactions.

The disparity of bargaining power between Williams and ITT would be one factor tending to prove that the contract was procedurally unconscionable. A finding of procedural unconscionability, or that the contract is one of adhesion, however, requires more. "Black's Law Dictionary (5 Ed.1979) 38, defines a contract of adhesion as a '[s]tandardized contract form offered to consumers of goods and services on essentially "take it or leave it" basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract. * * *' " *Sekeres v. Arbaugh* (1987), 31 Ohio St.3d 24, 31, 31 OBR 75, 81, 508 N.E.2d 941, 946–947 (H. Brown, J., dissenting), citing *Wheeler v. St. Joseph Hosp.* (1976), 63 Cal.App.3d 345, 356, 133 Cal.Rptr. 775, 783; *Std. Oil Co. of California v. Perkins* (C.A.9, 1965), 347 F.2d 379, 383. See, also, *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 37, 514 N.E.2d 702, 707, fn. 7.

In the present case, Williams did not demonstrate that she would have been unable to obtain a loan from other sources. In fact, part of her civil conspiracy argument is that ITT targeted her for a loan because of the substantial amount of equity that she had built up in her house.

There is no evidence in the record that the arbitration clause was concealed or misrepresented to Williams. In fact, the record reveals that Williams did read

the contract and understood after she read the contract that she had three days to cancel.

Additionally, there are differences between this case and *Patterson* relating to substantive unconscionability. The *Patterson* court remarked that "arbitration per se may be within the reasonable expectations of most consumers," but noted that some of the terms of the particular contract, when combined with the NAF's procedural rules, were oppressive to the consumer. *Patterson v. ITT Consumer Fin. Corp.,* 14 Cal.App.4th at 1665, 18 Cal.Rptr.2d at 566. The court concluded that the arbitration clause at issue was worded so that it could mislead a reasonable reader to believe that he or she had in fact agreed to arbitration in Minnesota. That is not true in our case, where the arbitration clause states in bold print:

"You and ITT Financial Services agree that, other than judicial foreclosures and cancellations regarding real estate security, any dispute, past, present, or future, between us or claim by either against the other or any agent or affiliate of the other, whether related to your loan, products you purchase through ITT Financial Services, or otherwise, shall be resolved by binding arbitration in accordance with the arbitration rules of the National Arbitration Forum, Minneapolis, Minnesota, and judgment upon any award by the arbitrator may be entered in any court having jurisdiction over claims of the amount of the award. We agree that the transactions between us are in interstate commerce and this agreement shall be subject to 9 USC §1–14, as amended."

In turn, Rule 14 of the NAF Code of Procedure mandates that "[a]ll Participatory Hearing Sessions shall be held in the Federal Judicial District where the Arbitration Agreement was executed." Accordingly, there is nothing in the contract language under consideration to lead a reasonable consumer to believe that he or she would have to arbitrate the dispute in Minnesota.

The *Patterson* court also appears to have considered it important that the case was one that involved a small claim, but, because of the arbitration clause, the consumers therein would be forced to spend a minimum of $850 on a dispute over a $2,000 loan. Additionally, part of the *Patterson* court's concern that the likely effect of the NAF procedures would be "to deny a borrower against whom a claim has been brought any opportunity to a hearing, much less a hearing held where the contract was signed, *unless the borrower had considerable legal expertise or the money to hire a lawyer and/or prepay substantial hearing fees*" may relate to the fact that absent the arbitration agreement, a proper venue for the claims involved would have been small claims court. (Emphasis added.) *Id.* at 1666, 18 Cal.Rptr.2d at 566. Those concerns are not present in this case, where the plaintiff initiated the action seeking substantial compensatory and punitive damages and was at all times represented by an attorney.

Finally, the majority's reference to "evidence regarding the conspiracy between ITT and Blair as a fundamental reason for her entering into the loan agreement in the first place" does not support its conclusion that the case was properly withheld from arbitration. As is apparent from the majority opinion, the unlawful act underlying the civil conspiracy claim was fraud. Moreover, according to the majority, that fraud relates to either Blair's fraudulent inducement of Williams to contract with him for the home repairs or ITT's "acts of making the loans to Williams and others." There is neither evidence nor a finding by any court that ITT fraudulently induced Williams into agreeing to arbitrate her disputes, an issue separate from the fraud issue. Accordingly, those factual issues were proper subjects for arbitration, and did not provide the trial court a reason to withhold the case from arbitration. *ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 692 N.E.2d 574, syllabus; *Williams v. Aetna Fin. Co.* (1992), 65 Ohio St.3d 1203, 602 N.E.2d 246 (Wright, J., dissenting). Labeling acts of fraud as "unconscionable" should not support the circumventing of this court's unanimous decision in *ABM Farms*.

It would be unfortunate if the breadth of today's decision works toward the wholesale invalidation of arbitration clauses in consumer transactions—a policy decision that, if made at all, should be made by the General Assembly.

### Punitive Damages

I disagree with the way that the majority analyzes the punitive damages issue, but nevertheless agree with its ultimate conclusion. As recognized by the majority, *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, sets out three guideposts for evaluating whether a punitive damages award is grossly excessive and therefore violative of due process. Those guideposts are (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm suffered by the plaintiffs and their punitive damages award, and (3) the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* at 574–575, 116 S.Ct. at 1598–1599, 134 L.Ed.2d at 826.

In addressing the first guidepost—the degree of reprehensibility of the defendant's conduct—the majority cites the jury's interrogatories and *the size of the punitive damages award itself* as demonstrating that ITT's conduct was sufficiently reprehensible to justify the large punitive damages award. That reasoning could be said to be circular and begs the true question related to the first *BMW* guidepost—which is whether, from a legally objective standpoint, the defendant's conduct was so reprehensible that it tends to justify the jury's award.

While Justice Breyer's concurrence in *BMW* states that a "strong presumption of validity" should attach to a punitive damages award, his concurrence does not support this majority's analysis. *Id.* at 586–587, 116 S.Ct. at 1604, 134 L.Ed.2d at

833. Justice Breyer's concurrence specifically noted that a jury's punitive damages award should be checked against legal standards "that provide 'reasonable constraints' within which 'discretion is exercised,' that assure 'meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages,' and permit 'appellate review [that] makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition' *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 20–21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 21–22. See also *id.*, at 18, 111 S.Ct. at 1043, 113 L.Ed.2d at 20 ('[U]nlimited jury discretion— or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities')." *Id.* at 587, 116 S.Ct. at 1605, 134 L.Ed.2d at 833–834. Accordingly, it is the court's duty to independently evaluate the jury's award in relation to the *BMW* guideposts. Deference to the jury's award does not replace the court's independent function in reviewing whether a punitive damages award is violative of due process.

Without explanation, the majority also states that "consideration of the other two [*BMW*] guideposts also results in a conclusion that due process was not violated." Thus, the majority does not explain its conclusion that a punitive damages award one hundred times the amount of actual damages bears a reasonable relationship to harm that resulted or that was likely to result from ITT's actions. The *BMW* court found a five-hundred-to-one ratio grossly excessive and further suggested that even a thirty-five-to-one ratio would weigh in favor of finding the punitive damages award grossly excessive. *Id.* at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 830, fn. 35. The *Haslip* court concluded that a punitive damages award four times the amount of compensatory damages "might be close to the line," but did not "cross the line into the area of constitutional impropriety." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. at 23–24, 111 S.Ct. at 1045, 113 L.Ed.2d at 23. And, calculating the potential harm to the victim if the tortious activity had succeeded, the court relied upon a ten-to-one ratio of punitive damages to potential harm in determining that punitive damages were not grossly excessive in *TXO Production Corp. v. Alliance Resources Corp.* (1993), 509 U.S. 443, 462, 113 S.Ct. 2711, 2722, 125 L.Ed.2d 366, 382. Considering the federal precedent, the second *BMW* factor would also appear to require deeper due process analysis than is apparent from the majority opinion.

Ultimately, I agree with the majority's conclusion that punitive damages are not so grossly excessive in this case that they violate due process. Relying on circumstances supporting the jury's finding of a civil conspiracy and Ohio's civil and criminal penalties for fraud, I find that this high ratio of actual damages to punitive damages passes constitutional muster. My differences with the majority in interpreting what *BMW* requires are purely theoretical. Nevertheless, I think it important to properly interpret the *BMW* guideposts as set forth by the United

States Supreme Court, because our interpretation may make a difference in future cases.

MOYER, C.J., concurs in the foregoing opinion.

---

LUNDBERG STRATTON, J., concurring in part and dissenting in part. I respectfully dissent from the majority's decision on arbitration and join in Justice Cook's dissenting opinion on the arbitration issue only. However, on all remaining issues, I join the majority.