LEMMON et al.

v.

**UNIVERSITY OF CINCINNATI.**

Court of Claims of Ohio.

No. 2000–01741.

Decided March 29, 2001.

**24**

---

*Joseph V. Pitstick,* for plaintiffs.

*Betty D. Montgomery,* Attorney General, and *Randall W. Knutti,* Assistant Attorney General, for defendant.

J. WARREN BETTIS, Judge.

This case was tried to the court on the issues of liability and damages. Plaintiffs, Christine Lemmon, Deborah Wallace, Rhonda Dunigan, James Hewitt, and Beth Skinner, were, at all times relevant hereto, students at defendant, University of Cincinnati, Clermont College ("UC"), enrolled in a Computerized Court Reporting ("CCR") program. This case was brought against defendant alleging breach of contract, fraud, and negligence.

Plaintiffs contend that when they enrolled in the CCR program, an important factor in their decision making process was the program's accreditation by the National Court Reporter's Association ("NCRA"). In order to be approved by that association, defendant's program had to fulfill certain minimum requirements. For example, the CCR program was required to prepare students for graduation with a specified word-per-minute ("wpm") speed level in each of the following areas: two-voice testimony, jury charges, and literary materials. Plaintiffs maintain that it was their understanding that if they adhered to the curriculum and received passing grades, not only would they graduate, but they would also be in compliance with the NCRA's Board on Approved Student Education requirements. As a result, plaintiffs would have been in a position to sit for, and presumably pass, the national accreditation exam offered by the NCRA.

The gravamen of plaintiffs' complaint concerns a particular teaching method utilized by Sunny Rhoads, one of their CCR instructors. Specifically, plaintiffs allege that Rhoads "slow-tested" them during two-voiced dictation tests, resulting in artificially high test scores. During these tests, Rhoads would stand in front of a display board depicting drawings of various "speakers," with a light over each speaker's head. When a speaker was about to speak, Rhoads would activate the light over that speaker, start a stopwatch, and the speaker would begin. When the speaker finished, Rhoads would deactivate the light, stop the watch, and the speaking would end. Another speaker's light would then be activated and the stopwatch timing would resume. Over the course of a standard five-minute test, the pause intervals between speakers could accumulate to as much as two extra minutes. In other words, what was characterized as a five-minute test could actually consume seven minutes. Plaintiffs maintain that the artificially high test scores that resulted from this practice caused them to falsely believe that they were going to achieve the wpm requirements needed for graduation, and, therefore, they were induced to continue paying tuition and attempting to complete the program.

Plaintiff Christine Lemmon was among the first of the plaintiffs to notice the alleged timing discrepancy associated with instructor Rhoads's tests. To verify her suspicions, Lemmon began to time tests that were administered by Rhoads. On three separate days, she timed twenty-six tests that ran longer than five

minutes. Lemmon then confronted Rhoads with her findings. When Rhoads denied that there was such a problem, Lemmon approached several university administration officials regarding the matter. Thereafter, Lemmon met with Dean Roger Barry and requested a tuition refund. The request was denied. Lemmon then complained to the NCRA and an investigation of the CCR program ensued. The NCRA was provided with approximately thirteen tapes of Rhoads dictating two-voice testimony. Ultimately, the NCRA identified problems with two of Rhoads's timings and concluded, among other things, that the "pause method" used by Rhoads was not acceptable and should be discontinued. Lemmon was subsequently granted a refund for her CCR courses and those courses were removed from her transcript. None of the other plaintiffs has received a refund; however, all of them have attempted to obtain one. Moreover, all of the plaintiffs, including Lemmon, are seeking a full tuition refund for all of their course work at Clermont College and for a variety of other costs they incurred as a result of being enrolled in the program.

## Breach of Contract

A contract is formed between a student and a university when a student enrolls at the university, pays tuition, and attends classes. *Behrend v. State* (1977), 55 Ohio App.2d 135, 139, 9 O.O.3d 280, 282, 379 N.E.2d 617, 620. In this case, plaintiffs maintain that defendant breached its contract with them by failing to comply with the NCRA standards that it was required to maintain and that it held itself out to possess. Defendant maintains that there was no contract between the students and the NCRA or, even if there were, that defendant did not breach that contract. Moreover, defendant argues that plaintiffs' claim is essentially one of educational malpractice. However, it is defendant's position that plaintiffs' claim is not recognized in the state of Ohio.

"[A] breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party perform[s] its contractual obligations; the other party fail[s] to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffer[s] damages * * *." *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 108, 661 N.E.2d 218, 226. In this case, the court disagrees with defendant's argument that the terms of the NCRA contract with UC did not extend to the students. A contract existed between UC and the NCRA. By its nature, the terms of the contract between UC and the NCRA must apply to the students. The agreement sets the standards for the CCR educational program, and students cannot be granted a certificate or degree unless the requisite standards have been met. However, for several reasons, the court concludes that no breach of contract occurred.

First, there is nothing in the NCRA General Requirements and Minimum Standards, or any other evidence submitted in this case, that sets forth a

definitive requirement as to the method for administering two-voice dictation to students. The method used by Rhoads was not inherently unreasonable; she simply dictated the required number of words for a five-minute test, but she did not time students during the pause between speakers when there was no voice dictation being given. Nevertheless, the NCRA ultimately determined that this method was unacceptable and required that the tests be timed for five straight minutes with no interruption. Rhoads was never "disapproved" as a qualified instructor according to NCRA standards. To the contrary, she had eleven years of teaching experience, had been the managing reporter at a large, free-lance reporting firm, and had a variety of other court reporting experience. In its last visit to UC, prior to the investigation prompted by Lemmon, the NCRA expressed no concerns with the academic preparation and/or competency of the CCR faculty. Moreover, UC never lost its NCRA accreditation at any time during, or after, the events that gave rise to the complaint in this case.

Second, UC made every effort to fulfill its contractual obligation, to allay plaintiffs' concerns regarding the validity of the testing and the CCR program in general, and to assist the students in achieving their educational goals. For example, following Lemmon's complaint, the university adjusted its practices so that live dictation tapes were monitored by the associate dean, or a designee, at random intervals; use of the light board was discontinued except for student practice sessions; and Rhoads was required to adjust her dictation method to ensure that all future tests would be given with no pauses. The students were offered an additional speed lab at no cost; efforts were made to locate other, comparable CCR programs; to assist students in transferring to those programs, an additional or replacement instructor was offered. None of the plaintiffs responded to or took advantage of these offers.

Finally, based upon the grade transcripts and the testimony presented, it is the court's opinion that none of the plaintiffs would have been able to succeed in the program even if a no-pause testing method had been utilized throughout their instruction. The CCR program at Clermont College was a two-year associate degree program. As students progressed through the program, they were required to pass tests at increasingly higher speed and accuracy levels. With regard to the two-voice dictation tests, NCRA standards required that students achieve a 225–wpm speed, with ninety-five percent accuracy, by the time of graduation. At the point where Lemmon confronted Rhoads, it was finals week of winter quarter 1996, approximately one and one-half years into the program.[1]

---

1. The other plaintiffs also got involved at or around this time, either because they were aware of Lemmon's confrontation with Rhoads, or because of their own doubts about Rhoads's teaching methods.

The students were expected to achieve a 160–wpm speed level to progress to the next level of training. All of the plaintiffs were struggling to achieve that speed. Three of the plaintiffs were failing their CCR courses. Since none of the plaintiffs took advantage of UC's offers to correct the unsatisfactory teaching method, it is impossible for this court to determine if any of the plaintiffs would have succeeded had they been consistently tested at a higher speed. Rather, the court finds from the evidence that plaintiffs' dissatisfaction with Rhoads' teaching methods, and with the UC program overall, was a way to rationalize their own inability to meet demanding course requirements. Accordingly, the court concludes that none of the elements for a breach of contract exists in this case.

## Fraud

The elements of fraud are: (a) a representation of fact; (b) which is material; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 169, 10 OBR 500, 502, 462 N.E.2d 407, 409, quoting *Friedland v. Lipman* (1980), 68 Ohio App.2d 255, 22 O.O.3d 422, 429 N.E.2d 456, paragraph one of the syllabus. In the present case, plaintiffs allege that UC committed fraud in representing to plaintiffs that they were achieving certain levels of speed when, in reality, they were not close to achieving those speeds. For example, at the time when Lemmon confronted Rhoads, she was the only one of the five plaintiffs who had come close to achieving the required 160–wpm speed level. However, she subsequently learned that her best results were closer to 102 to 123 wpm. Plaintiffs maintain that the representations concerning their scores were clearly material and "obviously" false. They cite the fact that Lemmon received a refund as a tacit admission of UC's guilt.

After considering all of the evidence, the court finds these allegations fail, for virtually the same reasons as plaintiffs' claim for breach of contract. For example, there is no evidence that Rhoads knew, or should have known, prior to the NCRA investigation, that the pause method was inappropriate, or contrary to NCRA guidelines. Thus, the court cannot find that any false or material misrepresentation of fact occurred. Rhoads had been teaching for many years, and there is no evidence that any students, other than plaintiffs herein, recognized or complained about an inappropriate teaching method. As stated previously, the NCRA did not withdraw its approval of the UC program or the CCR staff. Moreover, it cannot be determined whether the "inflated" test scores made any material difference in plaintiffs' success with the CCR program since it is unlikely that any of them would have succeeded with the program had a different

method been utilized. With respect to any inference that may be drawn from the granting of a refund to Lemmon, this court does not agree that this action constitutes an "admission." It is the court's view that UC simply addressed Lemmon's concerns to the best of its ability at the time, before it realized how many other students intended to follow suit.

## Negligence

█ Plaintiffs did not specifically assert this claim in the closing arguments at trial or in their post-trial brief. However, to the extent that it was raised in the complaint or that it remains a viable claim in this case, the court agrees with defendant's argument that the claim, however characterized, is essentially one of educational malpractice. However, the claim is not recognized in the state of Ohio and will not be further addressed. See *Malone v. Academy of Court Reporting* (1990), 64 Ohio App.3d 588, 593, 582 N.E.2d 54, 58.

For the forgoing reasons, the court finds that plaintiffs have failed to prove by a preponderance of the evidence that they are entitled to judgment on any of the claims asserted in their complaint. Accordingly, judgment shall be rendered in favor of defendant.

*Judgment for defendant.*

J. WARREN BETTIS, J., retired, of the Columbiana County Court of Common Pleas, sitting by assignment.