ALLISON, Appellant,

v.

COOK et al., Appellees.

[Cite as *Allison v. Cook* (2000), 139 Ohio App.3d 473.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA99–09–109.

Decided Oct. 16, 2000.

474

---

*John D. Smith,* for appellant.

*Allen & Crossley, Paige A. Crossley* and *Mitchell W. Allen,* for appellee Marie E. Cook.

*Thomas H. Pyper,* for appellee Rhonda Coffman.

---

WALSH, Judge.

Plaintiff-appellant, Samuel J. Allison, appeals the decision of the Warren County Court of Common Pleas granting judgment in favor of defendants-appellees, Marie E. Cook and Rhonda Coffman.

This suit involves the property located at 146 West Main Street, village of Harveysburg, Warren County, Ohio ("the property"). On its west and southwest borders, the property abuts lakefront land owned by the Army Corps of Engineers ("the Corps land") surrounding Caesar Creek Lake. The property's northern boundary is another private lot. The eastern side of the property is street frontage.

Looking at the property from the street, the property includes a carport along the southernmost boundary, with a concrete patio in the southwest corner behind the carport. A house is located just north of the carport and the patio near the western property line. A sidewalk and fence once ran from the patio behind the house, apparently above an embankment secured by a concrete retaining wall.

North of the house on the western border is a two-car garage. North of the garage was once a tool shed, situated on a ledge running along the western property line. The shed was supported by concrete bricks and wooden boards. In front of the garage and beside the house is a lawn. Standing on the lawn at the western property line between the house and the garage, or between the garage and the tool shed, one can see the Corps land and the lake.

Cook and her husband purchased the property in 1983. Cook's husband maintained the house and property until he died in 1991. Little maintenance was done after that time. In early 1994, Cook noticed the Corps land falling into the lake. Cook told Blake Brewer, then mayor of Harveysburg, who then contacted the Corps. The Corps investigated and assured Cook that the property had not moved and was safe. No further problems occurred.

In early 1995, Coffman, a realtor with E.A. Florence Realty in Waynesville, Ohio, came to Cook's home. Coffman had sold properties in the area and was seeking new sales. Cook was not interested, but she took Coffman's card.

In early 1996, there were unusually heavy rains and the lake rose dramatically. Cook's then-fiancé, Dwight Dean, noticed that the sidewalk was cracking and moving away from the house. On Sunday, May 5, 1996, the southwest corner of the property fell, creating a ravine. Parts of the sidewalk and patio fell. The ground beneath these washed away, exposing a tank underneath the house that contained fuel for the furnace.

Cook called Maria Willis, then mayor of Harveysburg, and told her what had happened. Willis looked at the property that day. The Massie Township, Ohio Fire Department, which services Harveysburg, investigated and concluded that the house was unstable. The fire department ordered Cook to move out, and to empty and remove the fuel tank because it posed a danger. Willis called utility companies to turn off services. The fire department placed yellow caution tape around the perimeter of the property, as well as danger signs on the street frontage. Cook believed that the land collapse stemmed from the Corps land, which seemed to be falling into the lake, creating a ravine into which the southwest corner fell.

Cook called Coffman for an "opinion of value," an informal appraisal of the property. Cook was preparing a property insurance claim and contemplating action against the Corps. Cook and Coffman walked the property, discussing the property's value as if the southwest corner were intact. Coffman opined that, without the damage, the property would be worth about $77,500.

Cook submitted a claim to Travelers Insurance Company ("Travelers"), her homeowner's insurance carrier. On May 13, 1996, Travelers sent James Nickoli, a structural engineer, to investigate. Nickoli walked the property with Cook and Clayton Talley, Cook's insurance adjuster. Cook informed Nickoli that she had received cost estimates to move the house inland.

Nickoli told Cook that the problems with the property appeared to be caused by the Corps land falling into the lake. He said that unless the Corps took action, nothing could be done to stop further damage to the property. Nickoli reported to Travelers that underground land slippage was causing the settling problems, but Cook did not receive a copy of the report. Talley wrote Cook a letter stating that the damage was excluded from coverage, but Cook lost the letter and is unsure of its exact contents.

After May 1996, the property stabilized. By this time, the embankment behind the shed had collapsed. The drop-off in this area was now steeper and higher, leaving a nearly twenty-foot drop behind the shed.

In June 1996, Cook contacted Willis and told her that the property had been inspected and found safe. Cook wanted utility services resumed so that she could move back in. Willis informed the electric company that since the property was determined safe by an inspection, service could be resumed. In fact, Cook had not solicited any inspections. Nor did she move back in. Instead, she bought a home elsewhere. Cook expressed fear of moving back due to the land collapses.

Throughout this time, Cook contacted the Corps and Senator Michael DeWine's office in Columbus, Ohio, in an attempt to determine the cause of the collapses. The Corps provided no information. In August 1996, Sen. DeWine's office told Cook that excessive rainfall, combined with bad gutter drainage and natural erosion, was causing the problems. Cook found this explanation questionable.

In late 1996, Cook and Dean sought to sue the Corps for information about the Corps land and to force the Corps to remedy any problems. When it became obvious that such action would be costly and time-consuming, Cook decided to sell the property. Cook called Coffman to list the property. They met on January 10, 1997, and Coffman briefly inspected the property at that time.

Cook and Coffman filled out a multiple listing service form on the property. Cook told Coffman the reasons she got from "the state" for the collapse of the southwest corner. The property was listed for $64,900. Coffman and Cook reduced the price from the earlier "opinion of value" to account for repairing the southwest corner.

Cook and Coffman also filled out a residential property disclosure form listing defects on the property. The form designated any flooding, drainage, settling or grading problems as "visible." The form disclosed that the fuel tank was empty. No mention was made of the history of the property or the Corps land, or that the fire department had ordered that the fuel tank be drained and removed. Cook signed a dual agency agreement allowing Coffman to represent Cook and any potential buyer.

Coffman called Willis and asked if she could remove the caution tape from around the property so it could be sold. Because the village was no longer involved with the property, Coffman was allowed to do as she wished. Cook and Dean then removed the caution tape and danger notices, leaving caution tape only across the southwest corner. Willis told Coffman there were problems clearly due to erosion on the property's western edge, not just its southwest corner. Willis told Coffman it was "morally wrong" to sell the property.

Allison saw the listing in a local newspaper. On Saturday, April 19, 1997, he called Coffman for an appointment. Because Coffman was busy, she told Allison to view the property by himself. He did so, walking around the property, but the

house was locked. Allison again called Coffman and met with her the same day. Coffman required that Allison sign a dual agency disclosure form so that she could represent both Allison and Cook.

Allison made an offer on the property, contingent upon an inspection and appraisal. Coffman was unable to find the property disclosure form. Allison and Coffman returned to the property. Allison asked Coffman about the damage to the southwest corner of the property. Coffman stated that the damage was due to the gutters not being maintained. Allison inquired if a retaining wall might repair the damage.

Coffman told Allison that the fire department moved Cook out after the southwest corner collapsed. She said that Cook was allowed to move back in because the fire department had incorrectly thought that the house was settling. She said that Cook did not return because she found housing closer to work.

Coffman gave Allison's offer to Cook, and Cook accepted it. Coffman and Cook then filled out a second property disclosure form. They listed that any flooding, drainage, settling, or grading problems were "visible along the south/southwest walls" of the house. They again indicated that the fuel tank was empty. No mention was made of the property's physical history or history of concerns. This second form was given to Allison on April 21, 1997.

On April 27, 1997, Allison had the house appraised and inspected. Coffman was present and told the inspector and the appraiser that the damage to the southwest corner was due solely to excessive rain and drainage from the gutters. Based upon this information, it was concluded that a retaining wall would secure the area. The inspector found the house secure. The property and house were appraised as worth about $81,000 if undamaged, but closer to $65,000 due to the need for a retaining wall and minor house repairs. The appraisal noted that Cook was making atypical concessions.

Allison made a post-inspection addendum to his offer, listing minor repairs and their estimated costs, as well as an estimate for a retaining wall. He requested that Cook lower the sale price and the interest rate on the mortgage Cook was financing. Cook agreed.

The parties closed on May 23, 1997. This was the only time that Allison and Cook met. Their only discussion concerned a tree that fell on the tool shed. Cook told Allison that she had called the Corps, but the Corps had yet to act. In all, Allison saw the property at least five times.

Allison signed a note securing a mortgage financed by Cook for approximately $42,000. Allison's down payment was more than $21,000. Coffman's agency received a commission of nearly $4,500, of which Coffman personally received

approximately $3,000. The contract of sale specifically stated that the sale was "as is."

Soon after Allison moved in, the Corps land on the property's western edge began collapsing. The fire department came out unannounced, asking if Allison had removed the fuel tank. The fire officials told Allison that the collapse of the southwest corner commenced with ground movement adjacent to the property that ultimately affected the property by taking the corner with it. The fire officials showed Allison where the property on the western boundary had settled, indicating that more land had dropped since 1996. The fire officials told Allison the history of landslides in that area and that the Corps was involved.

The western edge of the property continued falling, until the tool shed and a large part of the lawn fell away. More of the patio behind the carport and the sidewalk behind the house fell. The carport's concrete floor cracked and the carport began tilting backward toward the western property line. As the property's western edge fell away, an old septic tank was exposed. The shed and the septic tank later fell into a ravine on the Corps land behind the property's western edge. The ground underneath the garage gave way, leaving the back portion of the garage unsupported.

The land slippage was causing trees to fall. As the trees fell, they pulled up more dirt, causing the erosion problem to worsen. The Corps came and cut down trees on the Corps land to alleviate erosion.

After the property began settling, Allison called Coffman. He felt that he had been misled because he was not told about the property's settling problems. Coffman said she didn't know what Allison was talking about, but she would look into it. Allison sent letters to Cook and Coffman demanding that the sale be canceled. Coffman responded that she couldn't do that, but if Allison didn't want the property, she would sell it for him. Allison refused, believing that the property was too dangerous to be sold in good conscience. Cook never responded.

After living on the property for thirteen months, Allison left, afraid for his welfare. He moved into a house he owned elsewhere. Since Easter Sunday 1998, he has returned to the property only to visually inspect it. The landslides have continued northward along the property's western border, toward the neighboring lot.

Allison filed suit against Cook and Coffman seeking rescission of the sale contract or compensatory damages, as well as punitive damages and attorney fees. He based his claim for rescission upon a mutual mistake of fact concerning the actual condition of the property. He based his claim for compensatory damages upon fraud due to misrepresentation and concealment, alleging that

Cook and Coffman maliciously misrepresented and concealed the condition of the property.

Cook and Coffman answered separately. Both raised the affirmative defense of caveat emptor, arguing that this was an "as is" sale and that Allison had opportunity to inspect the property. Coffman also asserted that her representations were made in good faith reliance on Cook's information. Two weeks prior to trial, the Warren County Combined Health District condemned the house and property.

A bench trial was held. Allison was required to elect between remedies. He elected to seek rescission of the contract and return of his money from Cook, and compensatory damages from Coffman. He still sought punitive damages.

Allison testified himself and called Cook and Coffman on cross-examination. He presented Willis and Dean to establish the property's history. James Garrett, Allison's appraiser, and Nickoli testified about their inspections of the property. Cook and Coffman each testified in their own defenses. The parties admitted documentary exhibits and photographs of the property and structures taken since May 1996.

Willis testified that when she visited the property in 1996, it was clear that the property was unstable and falling away. There were cracks in the lawn into which she could completely step. Willis walked to the lakeshore, where she observed caverns in the Corps land created by the supporting ground being washed away. Willis believed that Cook had to know about the caverns because Dean and others had walked through the area taking pictures.

Willis met Allison when he was looking at the property. She commented to him that he had either to be "blind" to miss the signs of land slippage or have more "more money than God" to be able to fix the property. Allison laughed, saying that he was told that the problems were due to only bad gutters and drainage. Willis felt that if Allison had walked the lakeshore, he would have seen the ground falling away. She said that the lawn was settling.

Dean testified that he took pictures of the property after the 1996 collapses. By the time the property stabilized, the drop-off along the western boundary was plainly visible. Dean stated that when Cook decided to sell the property, he told her to disclose everything. When he saw the property disclosure form, he told Cook to disclose more. Cook responded that Coffman said that they need not disclose any additional information. Dean testified that when he expressed concerns to Coffman, she said that there was no need to disclose any land slippage because it had occurred on only the Corps land.

Nickoli, the structural engineer for Travelers, testified that Cook gave him a general history of the property, including her past concerns and her contact with

the Corps and village officials. Nickoli determined that a storm sewer drained into the ravine along the southwestern border, contributing to the erosion problem. Nickoli understood that Cook knew that the structures on her property might move, posing a danger, and that she knew there were land movement problems. It was not clear how far the damage would progress. He did not remember if he had told Cook all of his conclusions.

Nickoli saw that the Corps land contained an obvious rift, an open hillside, and pulled-up trees. Even though the damage to the Corps land was visible, this may have been because vegetation had been stripped away by the landslides. If the vegetation grew quickly, it could cover the damage. At that point, if one did not know what to look for, one would probably not recognize what had occurred.

Garrett testified that Coffman confirmed to him that the damage in the southwest corner was due to poorly maintained gutters. He saw neither visible damage along the western boundary nor cracks in the lawn. His appraisal factored in the need for a retaining wall. Had Garrett been told of the history of land slippage abutting the property, he would have deemed the property worthless and advised Allison to investigate the cause of the problems.

Allison testified that when he first viewed the property, the only caution tape was across the collapsed area in the southwest corner. Some tape was in an indiscriminate bundle in one tree limb by the garage and more tape was thrown into a garbage can by the garage. When he asked Coffman what had happened, she stated that the drains and gutters were loose from poor maintenance, washing away the soil underneath the walk and patio. He found no reason to question this statement. Allison said he and Coffman talked about the need for and the cost of a retaining wall. Based upon Coffman's information, Allison believed that the damage could be fixed, a belief confirmed by the appraisal and inspection.

Allison stated that Coffman told him that the fire department moved the owner (Cook) out because they thought the house was moving. It was immediately discovered that the house was not moving, because the fire department had incorrectly tested the house. Coffman said that Cook did not return because she found housing closer to her job.

When Allison inquired about a contract for sale, Coffman told him that he must first execute a dual agency agreement. Coffman told him there would be no problems with her representing both parties to the sale.

Allison stated that Coffman never related to him the details of the property's history or Cook's fears. Allison stated that Coffman told him that the only damage to the property was in the southwest corner, and that the property otherwise looked as it had thirty years before. Allison saw the ledge behind the

shed and garage, but he did not know what extent of the drop-off was due to recent damage. He saw no reason to walk behind the property onto the Corps land and along the lakefront. Coffman confirmed to Allison that the brown strips in the lawn were tire tracks, stating that a neighbor drove a truck through to deliver supplies for building a house.

When Allison received the property disclosure form, Coffman went over it with him item by item, including that the visible exterior problems in the southwest corner were only drainage problems. Although Allison did not rely on the property disclosure form when making his initial, contingent offer, he used it to review the appraisal and inspection and to conclude that the southwest corner was the only material defect.

Cook testified that when she noticed slippage on the Corps land in 1994, she did not think it inevitable that the property would be affected, but she thought it a real possibility. After the May 1996 collapses, she called the Corps to resolve what was happening, but she got no satisfactory answers.

Cook testified that when fire department came out, they told her only to empty the fuel tank, not to remove it. After she moved out, she never intended to return, because she was afraid something might happen. She wasn't sure when further problems might arise, but she knew that they would develop. Although Nickoli told her that if the Corps land was not repaired, it was useless to do anything on the property, she not receive a copy of his report.

When Cook and Coffman met, first in 1996 when Coffman rendered an "opinion of value" and later in 1997 to list the property, Cook told Coffman the property's history. Cook testified that she told Coffman that the erosion was due to more than just faulty downspouts and that she did not believe the explanation from Sen. DeWine's office. She told Coffman that she moved out because the property was falling away.

Cook stated that when she first listed the property with Coffman, they decided on a lower price due to the damage to the southwest corner. Coffman said not to consider Cook's belief that the Corps land was an impending danger, since the Corps land's condition had yet to encroach upon the property itself. Cook alleged that before the property was sold, she, Dean and Coffman visited the property. The slippage area on the Corps land was visible, and Coffman should have seen the property falling into the ravine by the western boundary.

Cook stated that when filling out the property disclosure form, she relied upon Coffman's expertise. Coffman told her that the problems on the Corps land and the Corps' reluctance to investigate need not be included, since the property itself was not the problem. Cook stated that Coffman told her that Allison was asking

for inspections, so he should verify problems on his own. Cook did not include the property's history and her concerns solely due to Coffman's assurances.

Cook testified that Coffman told her that Allison had walked the lakeshore and Corps land. If so, Allison should have seen any problems on the western boundary because of the drop-off on the property. The western slope looked like the ground underneath it had "literally disappeared." No one could miss it, especially if looking from the bottom of the slope.

At the closing, Cook did not mention the property's history. She thought Coffman had related this to Allison, and she knew that Allison had visited the property. Cook has not since spoken with Allison. Cook believed that she had disclosed everything required and that Allison should have discovered any further problems.

Coffman testified that when she first met Cook in 1995, she was selling properties in the area and was aware of the area's history. When Coffman went out to the property in 1996, Cook told her what had happened, and that she was submitting an insurance claim. Cook told her that she was told to leave due to concerns of the house's falling.

When Coffman went out in January 1997, the damage to the southwest corner was more extensive than in May 1996. Coffman also noticed tire tracks in the lawn. Cook told her that she had been told that the damage to the southwest corner was from bad drainage and heavy rains. Cook nonetheless wondered if the damage was actually due to the lake, suggesting that there may be problems on the Corps land. Coffman stated that Cook never told her of landslides other than the southwest corner.

Coffman had Cook execute the listing agreement and a dual agency disclosure form. Her brokerage required that a dual agency agreement be executed in all sales so that it did not have to split the sale commission with other brokers. Coffman and Cook completed the first property disclosure form at this time. Even when they filled out the second form, Coffman said that she did not explain to Cook what information was being asked for in the form; she only read the questions and wrote down Cook's answers. Coffman stated that any defects and history not included on the property disclosure form either were not required or were not disclosed to her. Coffman denied walking the property with Cook and Dean before the closing.

Coffman testified that Cook did not tell her about landslides on the property's western boundary when they filled out the property disclosure form. When Coffman was on the property, she did not see anything indicating a continuing problem. She saw nothing which would put a buyer on notice that there were

problems other than in the southwest corner. Coffman said that the first time she heard of such problems was when Allison contacted her after the sale.

Coffman testified that she did not know if the fire department ordered the fuel tank's removal, but she then admitted that the tank was ordered to be removed due to the danger it posed. In any case, she felt that was only a cautionary measure by the fire department, not an actual order. She did not think it necessary to include that the tank was supposed to remain empty, because she believed that the tank was operable if one filled in the missing ground. Coffman's testimony whether she verbally told Allison about the fuel tank was conflicting.

Coffman admitted to knowing matters concerning the property's history never told to Allison. Before the property was listed, she saw caution tape stretched out other than in the southwest corner. She knew that the utilities were turned off for a time. Coffman was aware that Cook made inquiries regarding problems on the property. She knew Cook was concerned about the house falling and that Cook believed that the Corps land caused the problems, leading Cook to make allegations against the Corps. Coffman knew that Cook had visited attorneys for advice. Coffman also knew that after getting permission to move back, Cook refused to do so.

When Allison asked what had happened to the southwest corner, Coffman said that the state concluded that excessive rains and neglected downspouts caused a drainage problem, washing away the ground. Coffman showed Allison the northern property line and the tire tracks in the lawn. She made no mention of the problems along the western boundary. Coffman told Allison that Cook did not move back because she wanted to live closer to her work.

When talking over the contract for sale, Coffman did not discuss with Allison the "as is" clause or inquire if he knew the implications of such a provision. She did not advise Allison regarding what inspections to have done, instead listing only those he specifically mentioned as wanting. Nor did they discuss the provision in the post-inspection addendum to the sale contract waiving defects.

After the parties submitted written closing arguments, the trial court filed its decision. The trial court found that when Allison visited the property, the premises "were festooned with yellow ribbons placed by the local fire department." [1] The trial court found that the sale was "as is" and that Allison had opportunity to inspect the property. Allison and Cook never met before the

---

1. This finding of fact is contradicted by the record. Allison testified that yellow caution tape was stretched out across only the southwest corner, where the patio and sidewalk had collapsed. Cook and Dean testified that they removed the yellow caution tape from all other areas of the property. Coffman confirmed that the caution tape was removed.

closing, so all information given to Allison was through either Coffman or the property disclosure form. The trial court found that Allison received the property disclosure form only after the May 23, 1997 closing.[2]

The trial court found that caveat emptor governed real estate transactions; thus, a buyer could not complain of defects discovered after the sale where the buyer had full opportunity to inspect the property and where the buyer so inspected the property. The trial court found that exceptions to this rule, concerning undisclosed latent, or unobservable, defects were not applicable. The collapse of the southwest corner was plainly obvious. The ground slippage on the Corps land was neither on the property nor affecting the property at the time of the sale. The trial court further found that this ground slippage was "readily observable to any prudent buyer."

The trial court found that Cook and Coffman made no positive misrepresentations. Cook only relayed through Coffman what she was told by state officials. Although some answers on the property disclosure form may have been "incomplete," they were not fraudulent, since Allison had opportunity to inspect and because Allison did not rely upon the property disclosure form, "since he did not see it until after the closing." [3]

The trial court stated that Cook took full advantage of caveat emptor, remaining quiet and allowing Allison to investigate. Allison "decided that it would be to his benefit to buy the property despite his knowledge of its obvious questionable condition and without a more thorough investigation." The trial court concluded that "the law appears to dictate and we so find that any inaccuracies or inadequacies in the information provided by Mrs. Cook are outweighed by the fact that the conditions of the property were obvious, that the contract was an 'as is' contract, and [Allison] had ample opportunity to thoroughly inspect the premises."

Regarding the claim against Coffman, the trial court found that R .C. 4735.68(A) relieved Coffman of any liability "unless it is shown that she gave false information to [Allison] either knowingly or in the reckless disregard of the truth." The trial court concluded that Allison failed to prove actual knowledge or recklessness or that Coffman conveyed false information on her own initiative.[4]

---

**2.** This finding is contradicted by the record. Allison and Coffman testified that Allison was given the property disclosure form on April 21, 1997, a month before the closing. Allison's signature on the form is dated April 21, 1997. There was no contrary evidence.

**3.** This conclusion regarding Allison's reliance on the property disclosure form is questionable, as the trial court reached this determination based upon its finding that Allison received the property disclosure form after the closing of the sale.

**4.** The trial court treated Coffman as only Cook's agent, even though all parties agree that Coffman was a dual agent, as demonstrated by the executed dual agency disclosure forms.

The trial court ruled in favor of Cook and Coffman. Allison appeals, raising four assignments of error.

Assignment of Error No. 1:

"The trial court erred in holding that the doctrine of caveat emptor barred the plaintiff's claims of fraud against defendant Marie E. Cook."

Assignment of Error No. 3:

"The trial court erred in holding that the plaintiff, Samuel J. Allison, failed to prove his claim of mutual mistake against the defendant, Marie Cook."

Allison contends that he presented evidence that Cook misrepresented and concealed the condition of the property, thus precluding her from raising caveat emptor as a defense. Allison further contends that he proved a mutual mistake, entitling him to rescission of the sale.

Prior to trial, Allison elected to proceed against Cook on his claim for rescission. He voluntarily decided to forgo his claim against Cook for fraud based upon misrepresentation and concealment. Thus, Allison's only claim at trial against Cook was for rescission of the sale contract based upon a mutual mistake of fact, the actual cause of the landslides.

The trial court's decision is clear. Its ruling in Cook's favor was based upon a finding that she did not defraud Allison. Nothing suggests that the trial court resolved Allison's rescission claim. The trial court's decision does not include findings of fact showing that it even considered Allison's allegation of mutual mistake of fact. The trial court erred when it decided a claim no longer before it.

We vacate the trial court's judgment in Cook's favor and remand the cause for the trial court to decide Allison's elected rescission claim. The first and third assignments of error are sustained.

Assignment of Error No. 2:

"The trial court erred in finding that the plaintiff, Samuel J. Allison, did not prove his claims of fraud against the defendant-realtor, Rhonda Coffman."

Allison contends that the trial court erred in ruling that he failed to prove that Coffman committed fraud. Allison argues that Coffman provided him with false information and concealed other information from him.

The trial court based its decision only upon Coffman's relationship with Cook. Although the trial court's decision might be conclusive of Allison's fraud claim if Coffman had acted only as Cook's agent, the decision failed to apply the appropriate law and consider Coffman's fiduciary obligations to Allison.

Dual agency in a real estate transaction is defined by R.C. 4735.70(A) to include a "licensee [real estate agent] who represents both the purchaser and seller as clients in the same real estate transaction." R.C. 4735.62 makes the real estate agent a fiduciary of both parties once a dual agency is created. That section mandates that the real estate agent thereafter act in the interest of both clients, not just one client.

■■■■ The obligations of a dual agent to either client, and the interplay between the defense of caveat emptor and a dual agent's duties, were extensively discussed in *Parahoo v. Mancini* (Apr. 14, 1998), Franklin App. No. 97APE08–1071, unreported, 1998 WL 180539, at *12:

"[C]aveat emptor protects certain parties (in particular, sellers and sellers' agents) from claims based upon nondisclosure of readily discoverable defects and declares reliance on certain misrepresentation by such persons to be unreasonable as a matter of law. However, the rule does not apply to nondisclosure or misrepresentation by all parties involved in a real estate transaction. One of the underlying rationales governing the doctrine is that parties to a real estate transaction generally do not have a special relationship with each other that would occasion a special duty to make disclosures or permit reliance on such representation. While no such relationship exists between a seller and purchaser of real property, a special relationship does exist between a real estate agent and her clients—in particular, a fiduciary one.

"It is axiomatic that a real estate agent 'shall exercise fidelity and good faith toward his principal in all matters that fall within the sphere of his employment, and that the agent execute his commission with skill, care and diligence.' As noted by the Ohio Supreme Court, '[l]ike other professionals, a person holding a real estate license is held to a higher standard of competency and fairness than is a lay member of the public in the marketplace.' Included among his fiduciary duties to his client, a real estate agent is required to fully disclose facts known to him that are material to the transaction.

"Because of the affirmative obligations arising from the fiduciary relationship between a real estate agent and his clients, the defense of caveat emptor does not apply when a real estate agent fails to disclose to his clients facts known by him that are material to the transaction." (Citations omitted.)

The statutory fiduciary duties owed by a real estate agent to her client are included in R.C. 4735.62:

"In representing any client in an agency or subagency relationship, the licensee shall be a fiduciary of the client and shall use the licensee's best efforts to further the interest of the client including, but not limited to, doing all of the following:

"(A) Exercising reasonable skill and care in representing the client and carrying out the responsibilities of the agency relationship;

"(B) Performing the terms of any written agency agreement;

"(C) Following any lawful instructions of the client;

"(D) Performing all duties specified in this chapter in a manner that is loyal to the interest of the client;

"(E) Complying with all requirements of this chapter and other applicable statutes, rules, and regulations * * *;

"(F) Disclosing to the client any material facts of the transaction of which the licensee is aware or should be aware in the exercise of reasonable skill and care and that are not confidential information pursuant to a current or prior agency or dual agency relationship;

"(G) Advising the client to obtain expert advice related to material matters when necessary or appropriate[.]"

These duties are not exclusive. The real estate agent must still abide by the common-law fiduciary duties. R.C. 4735.57(B).

The only exception to these duties of disclosure and advice regards confidential information. A dual agent may not disclose the confidential information of one client to the other client. R.C. 4735.62(I). What constitutes confidential information is described in Ohio Adm.Code 1301:5–6–07, Appendix A:

"A dual agent may not disclose any confidential information that would place one party at an advantage over the other party and may not disclose any of the following information without the informed consent of the party to whom the information pertains: 1) that a buyer is willing to pay more than the price offered; 2) that a seller is willing to accept less than the asking price; 3) motivating factors of either party for buying or selling; 4) that a party will agree to financing terms other than those offered; 5) repairs or improvements a seller is willing to make as a condition of sale; 6) or any other concession having an economic impact upon the transaction that either party is willing to make."

In sum, unless confidential information is at issue, the real estate agent has an affirmative obligation to inform her client of all information material to the transaction. The real estate agent must also advise her client in furtherance of the client's interest. If a real estate agent fails to adhere to these fiduciary duties owed to her client, she may not thereafter assert caveat emptor as a defense to a claim that the real estate agent defrauded her client.

In the instant case, these obligations of the real estate agent must be considered in light of the elements required to prove a fraud:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relaying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." (Citations omitted.) *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868, certiorari denied (1999), 526 U.S. 1051, 119 S.Ct. 1357, 143 L.Ed.2d 518.

■ A real estate agent has an affirmative duty to disclose information to and advise her client on material matters. A failure to perform these duties, or a willful concealment of material matters, may support the client's fraud claim against the real estate agent.

The trial court did not consider the effect of Coffman's fiduciary duty to disclose material information and to advise Allison. The trial court considered Allison's fraud claim against Coffman only as if Coffman was Cook's agent. This is a critical oversight because Coffman admitted at trial to knowing nonconfidential facts regarding the property and Cook's concerns which she did not reveal to Allison. She also admitted to not advising Allison regarding other matters. The trial court did not determine whether such information and lack of advice concerned matters material to the transaction, and, if so, whether Allison proved the remaining elements of fraud.

We therefore vacate the trial court's ruling in Coffman's favor and remand the cause for the trial court to reconsider in light of the above legal standards. The second assignment of error is sustained.

Assignment of Error No. 4:

"The trial court erred in not holding that the facts proved by the plaintiff supported a finding of constructive fraud on the part of defendant, Marie E. Cook, and defendant, Rhonda Coffman."

Allison contends that even if he did not prove that Cook and Coffman committed an actual fraud, he established the elements necessary to support constructive fraud. In light of our determination of Allison's assignments of error with regard to his claim against Cook, this assignment of error is not well taken, as Allison proceeded upon his rescission claim, not his claim of fraud.

As applied to Coffman, this assignment of error is well taken, based upon our determination of Allison's second assignment of error. The issue of whether Coffman constructively defrauded Allison, in the event that actual fraud is not proven, must be reconsidered by the trial court, as it did not determine this issue

in light of Coffman's dual-agent status. The fourth assignment of error is therefore overruled as to Cook and sustained as to Coffman.

Judgment vacated and remanded for proceedings consistent with this opinion.

*Judgment accordingly.*

POWELL, P.J., and WILLIAM W. YOUNG, J., concur.