NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0050n.06

**No. 13-3385**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jan 21, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN STAFFORD, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| JEWELERS MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:  CLAY and ROGERS, Circuit Judges, and LUDINGTON, District Judge.[*]

LUDINGTON, District Judge.  On February 13, 2006, John Stafford and U.S. Diamond & Gold, doing business as Stafford's Jewelers (collectively, "Stafford"), shipped a 5.56-carat pink diamond to Julius Klein Diamonds ("JKD").  Stafford packaged the diamond and arranged for The Brinks Company to provide secured transportation from Dayton, Ohio to New York City.  JKD received the package the same day Stafford shipped it.  JKD claimed that upon opening the package, however, the diamond was missing.

In 2006, Stafford sued JKD—as well as Jewelers Mutual Insurance Company ("Jewelers Mutual"), Stafford's insurer—for damages related to the loss of the diamond.  JKD counterclaimed, alleging that Stafford had made false representations concerning the shipment (in fact, JKD contended that Stafford never shipped the pink diamond at all).  The case went to trial, and a jury

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

found in Stafford's favor, awarding over $1.7 million in damages.[1]  Stafford estimates the cost of successfully defending against JKD's counterclaim amounted to more than $1 million.

Stafford believes that the relevant insurance policy requires Jewelers Mutual to defend against JKD's counterclaim.  So after Jewelers Mutual disclaimed coverage in 2007 and again in 2011, Stafford filed a second lawsuit in 2012.  This appeal arises from that second case.  Stafford alleges that Jewelers Mutual breached the parties' insurance agreement and acted in bad faith when it refused to defend against JKD's counterclaim in the 2006 case.  Jewelers Mutual moved for judgment on the pleadings in the district court, the motion was granted, and Stafford's complaint was dismissed.  The district court concluded that JKD's counterclaim alleged a claim for fraud, which was not covered by the applicable policy, and thus Jewelers Mutual had no duty to defend. We AFFIRM the district court's decision.

## I

### A

Stafford's business is based in Dayton, Ohio.  In 1996, Prestige Diamond—a diamantaire in Los Angeles, California—contacted Stafford about doing business.  The businesses formed a relationship, and for six years diamonds flowed from Stafford to Prestige and from Prestige to Stafford. The arrangement continued until JKD, headquartered in New York City, acquired Prestige Diamond in 2002.  But the change had little impact on business: Zuri Mesica, the president of Prestige Diamond, stayed on with JKD, and by 2004 Stafford and JKD were involved in transactions amounting to hundreds of thousands of dollars.

---

[1] The trial concerned only Stafford's claims against JKD and JKD's counterclaim; as will be described, Jewelers Mutual was granted summary judgment and dismissed from the case prior to trial.

Mr. Stafford[2] says he acquired the 5.56-carat pink diamond in early June 2005. His explanation of the circumstances read like they were scripted for a movie. Mr. Stafford was attending a jewelry show in Las Vegas when he met Carl Vaughner (whom he called "the German") in a restaurant located in the Bellagio Hotel. Stafford Dep. 76, 84, *U.S. Diamond & Gold v. The Julius Klein Diamonds LLC*, No. 06-00371 (S.D. Ohio Dec. 28, 2007). Vaughner, in his late sixties or early seventies, wore a Patek Philippe watch (which Mr. Stafford testified was worth "a hundred thousand dollars plus") and a gold pinky ring. *Id*. at 80. After exchanging pleasantries, Vaughner produced what Mr. Stafford determined to be a "beautiful" pink diamond. *Id*. at 87. Vaughner related that "his father had bought it for his mother and she would never wear it. She considered it a bad luck stone." *Id*. at 90.

Despite the stone's ominous history, Mr. Stafford was interested in purchasing it. He testified that Vaughner "said he wanted eight for [the diamond]." *Id*. at 94. Mr. Stafford assumed Vaughner meant eight hundred thousand dollars, but he simply wanted eight thousand. Nothing more. Mr. Stafford testified that he told Vaughner, "I don't think you understand the value of what you have here[,]" but Vaughner only laughed and said "you Jews always want a better price." *Id*. at 95. Vaughner's remark offended Mr. Stafford, but he was not one to pass up such a bargain. Mr. Stafford had approximately nine thousand dollars in cash—his "blackjack money"—and he counted out eight thousand and gave it to Vaughner. *Id*. at 92, 96. Mr. Stafford told Vaughner that a driver's license was necessary to write out a receipt, and Vaughner responded that he "had left it in the car and that he'd need to go get it." *Id*. at 97. Vaughner excused himself and Mr. Stafford ordered breakfast, began eating, and waited. But Vaughner "never came back," and Mr. Stafford has not

---

[2] Throughout this opinion, "Mr. Stafford" refers to John Stafford, while "Stafford" refers to the collective Appellants (John Stafford and U.S. Diamond & Gold d/b/a Stafford's Jewelers).

seen or heard from him since. *Id*. at 97–98. Thus, Mr. Stafford "purchased for eight thousand dollars" an item worth "at least one point five million dollars," no strings attached. *Id*. at 101.

Mr. Stafford placed the diamond, valued somewhere between $1.5 and $1.8 million, in his personal safe located at Stafford's Jewelers. He did not tell anyone, including his wife, that he had done so.[3] Then, during the final months of 2005, Mr. Stafford contacted Mr. Mesica at JKD to discuss the pink diamond and JKD's potential interest in buying it. "Mr. Mesica indicated that JKD would be interested in purchasing the Pink Diamond, but that JKD would need to see the Pink Diamond first." Pls.' Compl. ¶ 15, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Nov. 27, 2006).

Around February 10, 2006, Mr. Stafford and Mr. Mesica again discussed the Pink Diamond. The parties "determined that Stafford's Jewelers . . . should ship the Pink Diamond to JKD in New York so that JKD could either (1) evaluate and purchase the Pink Diamond or (2) if not interested in buying the Pink Diamond, certify it for Stafford's Jewelers and return it." *Id*. ¶ 16.

On February 13, 2006, at approximately 9:00 a.m., Stafford's Jewelers made a call for a Brinks secured-transportation pickup. Stafford's Jewelers then took the following steps to package the pink diamond before it was shipped:

> Stafford's Jewelers placed the Pink Diamond into parcel paper and a "memo" was stapled to the parcel paper (a "memo" is a memorandum typical in the industry which is contained in the shipment of diamonds used to describe what is in the package). The "memo" was addressed to JKD's New York office. It read in pertinent part: "5.56ct Natural fancy intense Pink . . . Cushion /VS2 . . . Dear Saul, Please give . . . to Mr. Klein and see if he has any interest in buying . . . is not certed . . . but . . . will grade out Fancy intence [sic] Pink (no modifiers) VS2 . . . have not shown this stone to anyone else . . . has not been 'shopped around' . . . if . . . no interest, please send . . . back Brinks insured for $1,500,00.00 or just send back a check (hopefully) . . . ."

---

[3] As the district court noted, "[t]he only evidence that Stafford has that he ever had the Pink Diamond is his testimony and the fact that he sent a package to JKD insured for $1.5 million." Order 5, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Jan. 28, 2008).

The Pink Diamond was then placed into a legal size envelope and put into a clear plastic letter pouch supplied by United Parcel Service ("UPS"). This letter pouch was then attached to the inside of a standard UPS box. The box was filled with large plastic bubble packing and sealed with clear plastic packing tape. The box was then placed inside a Brinks' shipping bag and sealed with a Brinks' numbered plastic seal tag.

*Id.* ¶¶ 19–20. Around 3:00 p.m. on February 13, 2006, Brinks arrived at Stafford's Jewelers to pick up the pink diamond package. Stafford's Jewelers purchased $1,500,000 in shipping insurance through Brinks to insure the Pink Diamond pending delivery.

The following day, just after noon, Mr. Mesica called Mr. Stafford at Stafford's Jewelers and informed him "that the Pink Diamond package arrived but there was no Pink Diamond." *Id.* ¶ 23. Mr. Stafford was directed to an individual named "Heim"—responsible for shipping and receiving at JKD's New York office—who indicated that "the box arrived opened and was empty." *Id.* ¶ 24. During the conversation, Heim initially stated that the Brinks shipping bag had not been tampered with. Then Heim told Mr. Stafford "that the Brinks' shipping bag did reveal signs of tampering." *Id.* ¶ 26.

Confused and worried, Mr. Stafford called Brinks and learned that JKD's New York office "had signed for the package," and Brinks advised that it would conduct its own internal investigation. "Brinks further noted that JKD's signature was an indication on JKD's part that nothing was wrong with the [shipping] bag when it arrived at JKD in New York." *Id.* ¶ 30. An investigation by Brinks lasted over a month and concluded on March 17, 2006, "with a letter to Stafford's Jewelers denying any responsibility for the loss of the Pink Diamond." *Id.* ¶ 31. According to the Brinks report:

[T]he package was picked up sealed from Stafford's Jewelers, placed in a sealed container for transportation to New York by UPS, and that upon arriving in New York, the container and package were both still sealed. In conclusion, Brinks stated,

"our investigation has revealed no evidence of indication that the shipment was tampered with while in our possession."

*Id.* Although Stafford continued to contact JKD during the month of February 2006, JKD "refused further communication, asserting that the problem was between Mr. Stafford and Brinks." *Id.* ¶ 32.

**B**

Stafford had previously obtained an insurance policy (the Policy) through Jewelers Mutual to cover the period from September 19, 2005, to September 15, 2006. The Policy—a "Businessowners Special Policy"—was part of "Jewelers Pak number 912223" issued by Jewelers Mutual. The Pak included "three separate policies of insurance: (1) the Businessowners Special Policy (the 'Policy'); (2) the Jewelers Block Policy; and (3) the Commercial Umbrella Liability Policy." Order 5, *Stafford v. Jewelers Mutual Ins. Co.*, No. 12-00050 (S.D. Ohio Mar. 4, 2013).

This appeal centers on the provision of the Policy that deals with personal and advertising injuries. That provision is as follows:

COVERAGE P – PERSONAL INJURY LIABILITY/ADVERTISING INJURY LIABILITY

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "personal injury" or "advertising injury" to which this insurance applies.

1. "We" cover:

   a. "personal injury" arising out of an offense committed in the course of "your" business, excluding advertising, publishing, broadcasting, or telecasting done by "you" or on "your" behalf; and

   b. "advertising injury" arising out of an offense committed in the course of advertising "your" goods, products, or services.

2. The "personal injury" or "advertising injury" offense must be committed:

   a. within the "coverage territory"; and

> b. during the policy period.

Pls.' Compl. Exs. 1–3, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Nov. 27, 2006) ("Policy").

"Personal Injury" is defined in the Policy as occurring in one of four ways:

> "Personal injury" means injury (other than "bodily injury", "property damage", or "advertising injury") arising out of one or more of the following offenses:
>
> a. oral or written publication of material:
>
>> 1) that slanders or libels a person or organization;
>> 2) that disparages a person's or an organization's goods, products, or services; or
>> 3) that violates a person's right of privacy;
>
> b.  false arrest, detention, or imprisonment;
>
> c.  malicious prosecution; or
>
> d. wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies. This offense must be committed by or on behalf of the owner, landlord, or lessor of the room, dwelling, or premises.

*Id.* at 93. An "Advertising Injury" is defined as well:

> "Advertising injury" means injury (other than "bodily injury", "property damage", or "personal injury") arising out of one or more of the following offenses:
>
> a. oral or written publication of material:
>
>> 1) that slanders or libels a person or organization;
>> 2) that disparages a person's or organization's goods, products, or services; or
>> 3) that violates a person's right of privacy.
>
> b. misappropriation of advertising ideas or style of doing business.
>
> c.  infringement of copyright, title, slogan, trademark, or trade name.

*Id.* at 91.

**C**

-7-

After the pink diamond went missing, Stafford filed its first suit against JKD and Jewelers Mutual on October 23, 2006. Stafford originally filed the case in the Montgomery County Common Pleas Court of Ohio, but JKD and Jewelers Mutual removed it to the Southern District of Ohio on November 27, 2006. The complaint requested declaratory relief against Jewelers Mutual regarding coverage for the loss of the diamond and damages for breach of contract. Pls.' Compl. ¶¶ 75–85, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Nov. 27, 2006). The complaint alleged claims against JKD for negligence, breach of contract, unjust enrichment, conversion, civil liability for criminal acts, fraud, and replevin. *Id*. ¶¶ 37–74.

The district court eventually granted Jewelers Mutual's motion for summary judgment, concluding that "Stafford's Jewelers did not comply with the enforceable 'records' requirement in the Policy with regard to the Pink Diamond and is, therefore, not entitled to insurance coverage on the Pink Diamond." Order 16, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Jan. 28, 2008). Specifically, the district court established that after Mr. Stafford purchased the diamond and placed it in his personal safe, "[h]e did not tell anyone, including his wife." *Id*. at 3. Moreover, "no written documentation was ever issued by Stafford or by Stafford's Jewelers to memorialize the purchase of the Pink Diamond from Vaughner." *Id*. at 5. And, "[t]he Pink Diamond was never included in Stafford's Jewelers' inventory." *Id*. The Policy, however, required Stafford to keep "[a] detailed and itemized inventory of [the] property covered, which includes the quantity, description and value of the inventory at cost or as valued for reporting under the application attached to this policy." *Id*. at 6 (citation omitted). Because Stafford did not comply with that provision of the Policy, coverage did not apply to the loss of the diamond and Jewelers Mutual was dismissed from the 2006 lawsuit.

Although Jewelers Mutual was dismissed from the case, JKD was not. It filed a counterclaim against Stafford on April 12, 2007, alleging that Stafford "made false representations to JDK concerning the Pink Diamond which is the subject of this action . . . which plaintiffs allegedly shipped to JKD." Countercl. ¶ 28, *U.S. Diamond & Gold,* No. 06-00371 (S.D. Ohio Apr. 12, 2007). JKD argued that Stafford "falsely represented to JKD . . . that [it] had placed the Pink Diamond inside the UPS box." *Id*. ¶ 29. JKD alleged that Stafford "knew the falsity of these representations when they were made" and "made these false representations to JKD pursuant to an insurance fraud scheme, and made them with the intent of deceiving and defrauding JDK, and/or [Jewelers Mutual], and/or Brink's." *Id*. ¶¶ 30, 31. Finally, JKD claimed to have relied upon these false representations to its detriment. *Id*. ¶¶ 32, 33.

A jury adjudicated Stafford's and JKD's respective claims in November 2008. On May 13, 2009, based on that jury's verdict, the court entered judgment on Stafford's behalf:

> This action was tried before a duly impaneled Jury with the Honorable Thomas M. Rose presiding. The Jury has rendered its verdicts, and based upon these verdicts, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Plaintiffs U.S. Diamond and Gold d/b/a Stafford Jewelers and John M. Stafford recover from Defendant Julius Klein Diamonds LLC the amount of $1,708,400.00 plus post judgment interest pursuant to 28 U.S.C. § 1961. The amount, if any, of attorneys' fees and costs due to the Plaintiffs will be separately determined by this Court.

Judgment, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio May 13, 2009).

After trial, Stafford moved for attorney's fees and costs, and JKD filed a notice of appeal. The appeal was subsequently dismissed when JKD and Stafford entered into a confidential settlement agreement and mutual release. *See* Order 1, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Aug. 3, 2009). Pursuant to the settlement agreement, the May 13 judgment was vacated, and all claims and counterclaims were dismissed with prejudice, each party to pay its own costs. *Id*.

**D**

While the 2006 case was pending, Stafford requested that Jewelers Mutual defend against

JKD's counterclaim. In response to Stafford's request, Jewelers Mutual retained Howard Randell,

Esq., to assess whether coverage was warranted. Randell authored a coverage opinion dated

September 14, 2007, in which he concluded that JKD's counterclaim was not covered by the Policy.

Based on that report, on September 17, 2007, Jewelers Mutual sent a letter to Stafford refusing

coverage because JKD's counterclaim did not come within the Policy's provisions:

> Jewelers Mutual has completed its investigation of the claims made against you and
> Stafford's. Based upon the allegations of the JKD counterclaim, it is Jewelers
> Mutual's position that the captioned policy does not provide coverage and therefore
> Jewelers Mutual declines to accept Stafford's tender of defense and indemnity. In
> summary, the Jewelers Mutual/Stafford's policy provides coverage for bodily injury,
> property damage, personal injury, and advertising injury. The allegations in the JKD
> counterclaim do not constitute bodily injury, property damage, personal injury, or
> advertising injury. In addition, the allegations in the JKD counterclaim do not
> constitute an "occurrence" under the policy.
>
> Even if the policy provided coverage, which it does not, the policy excludes
> coverage for "property damage", "personal injury", and "advertising injury" when
> intentionally caused. Finally, the policy excludes coverage for punitive damages.
> As such, it is the position of Jewelers Mutual that all of the allegations against you
> and Stafford's are not covered under Jewelers Mutual Insurance Company policy
> number 912223.

Pls.' Am. Compl. Ex. C, at 5 (Oct. 29, 2012).

On October 2, 2007, Randell sent a second letter to Don Elliott, a commercial lines claim

manager for Jewelers Mutual. In that letter, Randell outlined the previous communications between

Jewelers Mutual and Stafford:

> Following Jewelers Mutual's September 17, 2007 claim declination to Stafford's and
> pursuant to your direction, we contacted Stafford's counsel to discuss the Julius
> Klein Diamonds' ("JKD") counterclaim and Jewelers Mutual's position. From our
> conference, it appeared that Stafford's counsel did not question, and possibly agreed
> with, Jewelers' position. We proposed to Stafford's counsel that Stafford's stipulate

that there is no coverage under the Jewelers Mutual/Staffords policy and agree to withdraw its tender of defense and indemnity of the JKD counterclaim. While Staffords' counsel did not agree, counsel suggested that we prepare a proposed letter agreement for her review. We have since forwarded a letter agreement to Stafford's counsel and will follow-up with her shortly.

Pls.' Mot. Reopen Ex. A-2, at (Jan. 22, 2013). Randell's billing records establish that counsel for Stafford and Jewelers Mutual conducted telephonic conferences concerning the stipulation and letter agreement on October 3, 12, and 15, 2007. *See* Pls.' Mot. Reopen Ex. A-3, at 3 (Jan. 22, 2013). The same records indicate that Jewelers Mutual received "proposed changes to the letter agreement" on October 24, 2007. *Id.* Two days later, the parties executed a letter agreement which indicated that "Stafford's, at this time, does not intend to contest Jewelers Mutual's coverage position as stated in its September 17, 2007 letter." Pls.' Am. Compl. Ex. G, at 11 (Oct. 29, 2012).

Because Jewelers Mutual refused coverage, Stafford undertook its own defense of JKD's counterclaim. According to Stafford's counsel, it "incurred legal fees in the approximate amount of $1,000,000 to successfully defend the counterclaims filed against it by JKD." Pls.' Mot. Reopen Ex. A-5, at 3 (Jan. 22, 2013).

After the 2006 case was resolved, on November 23, 2010, Stafford's insurance agent, Roy Johnson, again requested that Jewelers Mutual pay the costs for Stafford's defense against JKD's counterclaim. Almost three months later, Jewelers Mutual responded with a letter declining coverage. In its letter, Jewelers Mutual emphasized that Stafford's counsel "agreed not to 'contest Jewelers Mutual's coverage position as stated in its September 17, 2007 letter' and confirmed that Stafford 'does not intend to pursue its tender of defense and indemnity for the JKD counterclaim.'" Pls.' Mot. Reopen Ex. A-6, at 3 (Jan. 22, 2013). Jewelers Mutual also clarified that while it was

"always available to discuss the basis of Jewelers Mutual's coverage position," it was "unwilling to change [its] position without a reasonable basis" for doing so. *Id.*

On October 27, 2011, Stafford sent a letter to Jewelers Mutual "to demand [that it] change [its] position" and to provide a "reasonable basis" for doing so. Pls.' Mot. Reopen Ex. A-5, at 1 (Jan. 22, 2013). Stafford indicated that JKD's counterclaim constituted a claim for "personal injury" under the Policy, and that Stafford had not waived its right to contest Jewelers Mutual's coverage position. *Id.* at 2–3.

Jewelers Mutual responded with a January 3, 2012 letter confirming its decision to deny coverage and providing further explanation:

> Stafford's withdrew its tender of the defense of the JKD counterclaim and executed a letter agreement to that effect over four years ago. As a result, Stafford's may not now seek reimbursement for legal fees already incurred after it had previously agreed not to pursue its tender. . . . Where there is no demand, there is no duty to defend. . . . Based upon the above, it remains Jewelers Mutual's position that it had no duty to defend Stafford's in regard to the JKD counterclaim, a position agreed to by Stafford's when it withdrew its tender. As a result, Jeweler's Mutual denies Stafford's request for reimbursement of defense fees and expenses.

Pls.' Mot. Reopen Ex. A-8, at 1–3 (Jan. 22, 2013).

**E**

After receiving the January 3, 2012 correspondence, Stafford filed its second complaint against Jewelers Mutual on January 24, 2012. Like the 2006 case, the second was originally brought in the Montgomery County Common Pleas Court of Ohio. On February 17, 2012, Jewelers Mutual removed to a district court in the Southern District of Ohio pursuant to diversity jurisdiction. Subsequently, Stafford filed an amended complaint on October 29, 2012. The amended complaint requested a declaratory judgment determining that Jewelers Mutual owed Stafford a defense against

JKD's counterclaim. Stafford further alleged claims for breach of contract, conduct in bad faith, and punitive damages.

On October 29, 2012, Stafford filed a motion for partial summary judgment. *See* Pls.' Mot. Summ. J. (Oct. 29, 2012). Less than two weeks later, on November 12, 2012, Jewelers Mutual filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* Def.'s Mot. J. 1 (Nov. 12, 2012). Stafford then filed a motion to reopen and supplement the pending motions, which the court granted. *See* Order 2–4 (Mar. 4, 2013).

The district court addressed Jewelers Mutual's motion for judgment on the pleadings, concluded that coverage was not warranted, and dismissed Stafford's complaint. The court then dismissed Stafford's motion for summary judgment as moot.

The district court's opinion painstakingly addressed each argument the parties presented. The court first concluded that Jewelers Mutual had no duty to defend under the Policy because JKD's counterclaim only involved fraud, which is not covered by the Policy. *Id*. at 11. The court emphasized that the allegations in the counterclaim did not implicate torts covered by the Policy, such as disparagement, negligence, defamation, or malicious prosecution. *Id*. at 12–14. Next, the court concluded that fraud allegations did not concern a "personal injury" or an "advertising injury" under Coverage P of the Policy. *Id*. at 14–17. Accordingly, the court concluded there was no duty to defend, and "all of the claims in Stafford's [amended complaint] fail." *Id*. at 17.

Despite this conclusion, "in the interest of justice," the court went on to address Jewelers Mutual's other arguments against coverage under the Policy. The court held that application of the federal *res judicata* doctrine also barred all of Stafford's claims, *id*. at 24, and that even if it did not, "Stafford's failure to take any action on Jeweler's [sic] alleged failure to defend in the 2006 Case

constitutes a waiver," *id*. at 29.  The court also concluded that Stafford's bad faith claim was barred

by the applicable "four-year statute of limitations."  *Id*. at 19.  The court did not agree with Stafford

that the limitations period should be tolled due to wrongful concealment or that Jewelers Mutual

should be estopped from raising the defense.  *Id*. at 20–21.

The court summarized its conclusions succinctly with the following lines:

> The Court has considered Stafford's [amended complaint], documents both referred
> to in the [amended complaint] and attached to the [amended complaint], matters of
> public record, and the arguments of counsel.  Based upon this consideration, the only
> reasonable interpretation of JKD's counterclaim against Stafford is that it is a fraud
> claim.  Fraud claims are not covered by the Policy.  Thus, Jewelers [Mutual] has no
> duty to defend Stafford against JKD's counterclaim.  Because Jewelers [Mutual] has
> no duty to defend, all of the claims that Stafford brings in this lawsuit are dismissed.

> All of the claims that Stafford brings in this lawsuit may also be dismissed for other
> reasons.  The claims that Stafford has brought in this case are barred by the federal
> res judicata doctrine.  Also, Stafford withdrew its tender of these claims for defense
> in writing and Stafford waived its claims.  Finally, Stafford's bad faith claim is
> barred by the four-year statute of limitations.

*Id*. at 31.  The district court entered judgment on March 4, 2013.  Stafford filed a timely notice of

appeal on April 2, 2013.  *See* Fed. R. App. P. 4(a)(1)(A).

## II

### A

Before reaching the substantive issues involved in this appeal, one threshold question must

be addressed: whether the Court should take judicial notice of the documents involved in the 2006

case.  After filing its appellant brief, Stafford filed a motion requesting the Court to take "judicial

notice of the record in the [2006] [c]ase, Southern District of Ohio Case No. 3:06-cv-371."

Appellant's Mot. 2.

Jewelers Mutual filed a response indicating that it "agrees that judicial notice of the record in [the 2006 case] is appropriate as a matter of law." Appellee's Resp. 2. Jewelers Mutual also argues that "to the extent that the balance of Stafford's motion for judicial notice now attempts to raise arguments that were neither raised to the District Court below and were not raised in Stafford's Corrected Brief on Appeal . . . those arguments should be stricken." *Id.* Jewelers Mutual vaguely identifies those arguments as "those particularly set out at pp. 4–5" of Stafford's motion. *Id.* In its short reply to Jewelers Mutual's response, Stafford indicates that Jewelers Mutual's agreement concerning judicial notice "should end the inquiry" because it "disputes that it raised new arguments . . . ." Appellant's Reply 2, 3.

As established in *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005), "[a]ll circuits to consider the issue have noted that a court may take judicial notice of at least some documents of public record" when addressing a Rule 12 motion. *Id.* at 697 (collecting cases). However, taking judicial notice of documents has been limited by some courts to allow only "the use of such documents . . . for the fact of the documents' existence, and not for the truth of the matters asserted therein." *Id.* (collecting cases). In *Passa*, this Court clarified that "[i]n general, the majority of the cases which do not allow a court to take judicial notice of the contents of a public record do so because there is no way for an opposing party, prior to the issuance of the court's decision, to register his or her disagreement with the facts in the document of which the court was taking notice." *Id.* Accordingly, "in order to preserve a party's right to a fair hearing, a court . . . must only take judicial notice of facts which are not subject to reasonable dispute." *Id.*

But, as Stafford suggests, Jewelers Mutual's response resolves whether the 2006 case documents should be considered. Like Stafford, Jewelers Mutual encourages this Court to take

judicial notice of those documents.  Although it had the chance to dispute any of the factual content contained in those documents, Jewelers Mutual did not do so.  And, because the district court relied on many of the 2006 case documents in granting Jewelers Mutual's motion for judgment on the pleadings, it is necessary that those documents be considered on appeal as well.

**B**

A district court's decision regarding a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is analyzed using the same *de novo* standard of review employed for a motion to dismiss under Rule 12(b)(6).  *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (citing *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008)).  For purposes of a Rule 12(c) motion, all well-pleaded material allegations "must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id*. (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)).  A Rule 12(c) motion is appropriately granted "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."  *Id*. (quoting *Winget*, 510 F.3d at 582).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Id*. at 1964–65 (brackets and internal citations omitted).  In *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam), decided two weeks after *Twombly*, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant

fair notice of what the claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (internal quotation marks and ellipsis omitted) (quoting *Twomby*, 550 U.S. at 555). When reviewing a motion for judgment on the pleadings pursuant to Rule 12, this Court "read[s] the *Twombly* and *Erickson* decisions in conjunction with one another." *Sensations*, 526 F.3d at 295–96.

Accordingly, to survive a Rule 12(c) motion to dismiss, the well-pled allegations (taken as true) must raise a right to relief above the speculative level but need not go beyond "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Also, because jurisdiction in this case is predicated upon diversity, Ohio substantive law applies, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), as well as federal procedural law, *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996).

**III**

Stafford argues that the district court made numerous errors in granting Jewelers Mutual's motion for judgment on the pleadings. First, Stafford claims that the district court erred in holding Jewelers Mutual had no duty to defend against JKD's counterclaim. Stafford argues that the district court also erred when it concluded Stafford's claims were barred by *res judicata* and when it held that Stafford withdrew its tender of defense and therefore waived its claims. Finally, Stafford alleges that the district court erred when it determined that Stafford's bad faith claim was barred by the statute of limitations and that the limitations period was not tolled by Jewelers Mutual's fraudulent concealment or estoppel. Because the first issue—concerning Jewelers Mutual's duty to defend—is dispositive, it is the only issue addressed below.

**A**

The district court was correct when it concluded that the Policy does not provide coverage, even arguably, for JKD's counterclaim.  Because the counterclaim alleges that Stafford committed fraud, it does not fall within the Policy's provisions covering personal injury or advertising injury, and therefore all of Stafford's claims fail as a matter of law.

**1**

During the 2012 case, Stafford argued that JKD's counterclaim can be interpreted as disparagement, negligent misrepresentation, defamation, or malicious prosecution rather than fraud.  In its opinion granting judgment on the pleadings, the district court emphasized the fact that during the 2006 case,[4] Stafford consistently represented that JKD's counterclaim involved fraud and nothing else.  *See* Order 11 (Mar. 4, 2013).  The court then rejected each alternative interpretation Stafford offered, *id*. at 12–14, and construed the counterclaim as one for fraud.

The lower court's conclusion that JKD's counterclaim merely alleged fraud is accurate.  Under Ohio law, fraud is "a knowing misrepresentation of the truth to induce another to act to his or her detriment." *Curran v. Vincent*, 885 N.E.2d 964, 968 (Ohio Ct. App. 2007) (brackets, ellipsis, and footnote omitted).  The elements of fraud are as follows:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

---

[4] The same judge presided over both cases.

*Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 409 (Ohio 1984) (quoting *Friedland v. Lipman*, 429 N.E.2d 456 (Ohio 1980)).

JKD's counterclaim from the 2006 case, in its entirety, is reproduced below. The enumerated paragraphs of the counterclaim, from ¶¶ 28–33, precisely track the elements for a fraud claim under Ohio law:

27. Repeats and realleges the allegations of paragraphs 1-21 above, as if fully set forth hereat.

28. Plaintiffs John Stafford ("Stafford") and U.S. Diamond & Gold d/b/a Stafford's Jewelers ("Stafford's Jewelers") made false representations to JKD concerning the pink diamond which is the subject of this action (the "Pink Diamond"), which plaintiffs allegedly shipped to JKD, unsolicited and on approval, from their jewelry store in Ohio to JKD's offices in New York City.

29. Specifically, on February 14, 2006, after a Brink's shipping bag was delivered to JKD's offices in New York City, and the UPS box inside it proved to be empty when JKD opened it, plaintiff Stafford (acting individually and on behalf of plaintiff Stafford's Jewelers) falsely represented to JKD, in a telephone conversation with JKD's employee Chaim Eichenstain, that plaintiffs had placed the Pink Diamond inside the UPS box, and had placed the UPS box containing the Pink Diamond inside the Brink's shipping bag, prior to shipment, and falsely suggested to JKD that the Brink's shipping bag had been tampered with during the shipment process.

30. Upon information and belief, plaintiffs knew the falsity of these representations when they were made.

31. Upon information and belief, plaintiffs made these false representations to JKD pursuant to an insurance fraud scheme, and made them with the intent of deceiving and defrauding JKD, and/or plaintiffs' insurer, and/or Brink's.

32. JKD justifiably and rightly relied upon plaintiffs' false representations to their detriment, but undertaking various actions and incurring various expenses that they would not have undertaken or incurred absent plaintiffs' false representations.

33. Plaintiffs' false representations have caused JKD to suffer actual damages in an amount to be determined at trial, but believed to be in excess of

$25,000.00.

34.     Plaintiffs' false representations to JKD were intentional, knowing, malicious, reckless, and in conscious disregard of JKD's rights. Accordingly, JKD is entitled to recover punitive damages against plaintiffs in an amount to be determined at trial, but in excess of $25,000.00, as well as attorneys' fees and costs and pre- and post-judgment interest.

Countercl. ¶¶ 27–34, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Apr. 12, 2007). The allegations in JKD's counterclaim correspond with the elements of fraud under Ohio law, and Stafford consistently referred to the claim as one for fraud during the 2006 case. Clearly JKD intended to plead a fraud claim, and Stafford considered it as such.

Stafford now argues, at least since the 2012 case was commenced, that the counterclaim can be interpreted as advancing causes of action other than fraud, such as disparagement, reckless fraud,[5] defamation, and negligent misrepresentation. But even if JKD's counterclaim alleged more than fraud, which it does not, Stafford is foreclosed by the doctrine of judicial estoppel from arguing that the counterclaim involved other causes of action. Under the judicial estoppel doctrine, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

As the district court noted, in the 2006 case, Stafford consistently represented that JKD's counterclaim merely involved fraud. *See* Pls.' Answer Countercl. 3, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Apr. 16, 2007) ("JKD's Counterclaim fails as it has not pleaded its fraud counterclaim with the requisite specificity."); Pls.' Mot. Summ. J. 1, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Jan. 30, 2008) ("Plaintiffs . . . move this Court . . . for an Order entering summary

---

[5] As will be discussed, Ohio law does not recognize a claim for "reckless fraud," as opposed to a claim for "fraud."

judgment . . . against [JKD] on its Counterclaim alleging fraud."); Pls.' Prop. Jury Inst. 38, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Oct. 27, 2008) (indicating JKD's counterclaim involved the elements of fraud, and no others); Pls.' Mem. Law 1, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Nov. 13, 2008) ("JKD filed a counterclaim for fraud against Stafford Jewelers and Mr. Stafford. JKD has failed, however, as a matter of law, to prove the requisite elements of fraud").

Because Stafford took the position that JKD's counterclaim involved nothing but fraud throughout the 2006 case, and because Stafford then prevailed on that claim when it was presented to a jury, it cannot now assert the counterclaim instead alleges disparagement, defamation, or negligent misrepresentation. *See* Appellant Br. 6–20. Stafford simply cannot "play[] fast and loose with the courts, blow[] hot and cold as the occasion demands, [or] hav[e] [its] cake and eat it too." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (internal quotation marks omitted).

Accordingly, when addressing the question of whether the Policy extends coverage to JKD's counterclaim, the counterclaim will be analyzed as only one for fraud.

**2**

Stafford's Policy does not extend coverage to claims for fraud, so Jewelers Mutual had no duty to defend against JKD's counterclaim alleging fraud.

As established by the Ohio Supreme Court, an insurance company has the duty to defend an action against an insured when "the scope of the allegations of the complaint . . . brings the action within the coverage of the policy." *City of Willoughby Hills v. Cincinnati Ins. Co.*, 459 N.E.2d 555, 557 (Ohio 1984) (quoting *Motorists Mut. Ins. Co. v. Trainor*, 294 N.E.2d 874 (Ohio 1973)). Moreover, the duty to defend extends to situations where coverage is debatable:

-21-

[W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy of coverage has been pleaded, the insurer must accept the defense of the claim.

*Id.* at 558. A duty to defend may arise even if there is no duty to indemnify, *Motorists Mut. Ins. Co. v. Nat'l Dairy Herd Improvement Assn., Inc.*, 750 N.E.2d 1169, 1174 (Ohio Ct. App. 2001), as the duty to defend is "broader than . . . the duty to indemnify," *Granger v. Auto Owners Ins.*, 991 N.E.2d 1254, 1257 (Ohio Ct. App. 2013).

An insurer need not provide a defense, however, "if there is no set of facts alleged in the complaint which, if proven true, would invoke coverage." *Cincinnati Indemn. Co. v. Martin*, 710 N.E.2d 677, 678 (Ohio 1999) (citing *Preferred Risk Ins. Co. v. Gill*, 507 N.E.2d 1118, 1124 (Ohio 1987)). Whether a given claim is covered under the terms of an insurance policy is a question of law for the court to decide. *Columbia Cas. Co. v. City of St. Clairsville, Ohio*, No. 05-cv-898, 2007 WL 756706, at *15 (S.D. Ohio Mar. 8, 2007) (citations omitted); *see also Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982) (whether an insurance company extends coverage to a claim is a "question[] of law").

Insurance contracts "must be construed in accordance with the same rules as other written contracts." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 597 N.E.2d 1096, 1102 (Ohio 1992). The "most critical rule" prevents courts from rewriting a contract when the intent of the parties is evident, i.e., "if the language of the policy's provisions is clear and unambiguous, [a] court may not resort to construction of that language." *Id.* (internal quotation marks omitted). Accordingly, in reviewing an insurance policy, "words and phrases used therein 'must be given their natural and commonly accepted meaning, where they in fact possess such meaning, to the end that a reasonable

interpretation of the insurance contract consistent with the apparent object and plain intent of the parties may be determined.'" *Tomlinson v. Skolnik*, 540 N.E.2d 716, 717–18 (Ohio 1989) (quoting *Gomolka*, 436 N.E.2d at 1348). "Ambiguities in insurance policies should be construed liberally in favor of coverage." *Nat'l Dairy Herd*, 750 N.E.2d at 1174.

Stafford argues that JKD's counterclaim implicates a "personal injury" under Coverage P of the Policy, which establishes that Jewelers Mutual will pay all "personal injury" sums for which an insured becomes obligated. *See* Policy at 95–96. Again, "Personal Injury" is defined as:

> injury (other than "bodily injury", "property damage", or "advertising injury") arising out of one or more of the following offenses:
>
> a. oral or written publication of material:
>
>> 1) that slanders or libels a person or organization;
>> 2) that disparages a person's or an organization's goods, products, or services; or
>> 3) that violates a person's right of privacy;
>
> b. false arrest, detention, or imprisonment;
>
> c. malicious prosecution; or
>
> d. wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies. This offense must be committed by or on behalf of the owner, landlord, or lessor of the room, dwelling, or premises.

*Id*. at 93.

Simply put, JKD's counterclaim for fraud does not constitute a "Personal Injury" under the Policy because JKD's allegations do not align with the requirements for personal-injury coverage under section P. To begin with, the counterclaim does not allege (and Stafford does not argue otherwise) a claim for false arrest, detention, or imprisonment; malicious prosecution; or wrongful entry into, eviction from, or invasion of the right to private occupancy of a room, dwelling, or

premises. It follows that coverage can only arise from an oral or written publication of material that slanders JKD, disparages JKD's services, or violates JKD's right of privacy.

But JKD's counterclaim makes none of these allegations. Indeed, the counterclaim alleges only that Stafford "made false representations to JKD *concerning the pink diamond . . . .*" Countercl. ¶ 28, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Apr. 12, 2007) (emphasis added). Importantly, the counterclaim does *not* allege Stafford made false representations about anything but the pink diamond; the counterclaim does not include allegations that Stafford said anything about JKD or its services.

Moreover, even if Stafford's statements did concern JKD or its services, the statements were not published as required to confer coverage. *See* Policy at 93 (limiting injuries to "oral or written *publication* of material") (emphasis added). The Policy does not define "publication" in the context of personal-injury coverage, and accordingly, that term assumes its "plain and ordinary meaning." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). The Oxford English Dictionary defines "publication" as "Notification or communication to a third party or to a limited number of people regarded as representative of the public; an instance of this; *spec*. . . . (b) communication of defamatory words to a person or persons other than the person or organization defamed." *Publication Definition*, OxfordEnglishDictionary.com. Likewise, in the context of defamation, Black's Law Dictionary defines "publish" as "To communicate (defamatory words) to someone other than the person defamed." Black's Law Dictionary 1268 (8th ed. 2004).

Under either definition, Stafford's statements must have been made to a third party to constitute publication. But that is not what JKD alleged. *See* Countercl. ¶ 29, *U.S. Diamond & Gold*, No. 06-00371 (S.D. Ohio Apr. 12, 2007) ("Specifically, on February 14, 2006 . . . Stafford

. . . falsely represented *to JKD,* in a telephone conversation with *JKD's employee* Chaim Eichenstain, that plaintiffs had placed the Pink Diamond inside the UPS box, and had placed the UPS box containing the Pink Diamond inside the Brink's shipping bag, prior to shipment, and falsely suggested *to JKD* that the Brink's shipping bag had been tampered with during the shipment process.") (emphasis added).  It follows that even if JKD succeeded on its counterclaim, all that would have been proven is that Stafford committed fraud by making false representations to a JKD employee, not to any other person or entity.  Accordingly, there is "no set of facts alleged in the [counterclaim] which, if proven true, would invoke coverage," and Jewelers Mutual had no duty to defend.  *Martin*, 710 N.E.2d at 678.

Although the counterclaim does not allege publication to a third party, Stafford argues that it should not matter because "it is important to understand the Supreme Court of Ohio has clearly held the duty to defend need not arise solely from the allegations in the complaint but may arise at a point subsequent to the filing of the complaint (or counterclaim)."  Appellant Br. 9 (citation omitted).  Contrary to this assertion, however, Ohio courts have limited when it is appropriate to move beyond the allegations included in the complaint when determining whether a duty to defend is implicated:

> [T]he inquiry into the insurer[']s duty to defend must naturally begin with a close scrutinization of the allegations of the disputed complaint.  If such a review reveals claims which "potentially" or "arguably" fall within the purview of the policy, then, and only then, does *Willoughby Hills* dictate that a court look to extraneous matters to determine whether a defense is required of the insurer.  On the other hand where a court reviews a complaint and concludes beyond a doubt that there are not arguably covered claims encompassed therein it need not stretch the allegations beyond reason to impose a duty on the insurer.  To do so would effectively impose an absolute duty on the insurer to provide a defense to the insured regardless of the cause of action stated in the complaint.  Even under the liberal notions of notice pleading it would be inherently unfair to require the insurer to provide a defense where the pleadings

failed to notify, even arguably, that the insured is being sued on a claim covered by the policy.

*Nat'l Dairy Herd*, 750 N.E.2d at 1176–77. In this case, JKD's counterclaim alleged a claim for fraud—a claim not covered by the Policy—so there is no need to move beyond the counterclaim. Stafford's attempt to construe the claim as implicating some other cause of action through materials extraneous to the counterclaim would "stretch the allegations beyond reason to impose a duty" on Jewelers Mutual, and those arguments find no traction here.[6]

**B**

Aside from its request for declaratory judgment concerning Jewelers Mutual's duty to defend against JKD's counterclaim, Stafford's amended complaint in the 2012 case alleges claims for breach of contract (Count II), bad faith (Count III), and punitive damages (Count IV). *See* Pls.' Am. Compl. ¶¶ 116–123 (Oct. 29, 2012). As the district court correctly noted, however, if there is no coverage under the Policy for JKD's counterclaim, these three claims must fail. This result follows because each claim is related to Jewelers Mutual's refusal to defend: if there was no duty to defend,

---

[6] Stafford argues that JKD's counterclaim could constitute "reckless fraud," without any explanation of what reckless fraud is or how it applies here. *See* Appellant Br. 13. Ohio courts, however, do not recognize "reckless fraud" as a viable claim. *See Offenbeher v. Lomax Soful & Foster, Inc.*, No. 17725, 1996 WL 539134, at *4 (Ohio Ct. App. Sept. 25, 1996) (holding that reckless conduct may be used "to infer the element of 'knowledge,'" but that an appellant must still demonstrate intent). Rather, the elements of fraud include representations "made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false *that knowledge may be inferred . . . .*"*Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 409 (Ohio 1984) (emphasis added). As Ohio courts rightly note, the recklessness component is merely a method of inferring that a party acted with knowledge; it does not allow for a fraud claim that falls short of establishing the elements of knowledge and intent.

Stafford also argues that "[t]he counterclaim asserts these false representations were made maliciously, recklessly, and in conscious disregard of JDK's [sic] rights—all allegations that fall short of the knowingly false requirement, so the exclusion does not bar coverage." Appellant Br. 17. Stafford is, however, incorrect. JKD's counterclaim alleges a claim for fraud, and "[i]n the context of fraud claims, a plaintiff has the burden to prove that defendant knowingly and intentionally misled or deceived plaintiff." *Doyle v. Fairfield Machine Co., Inc.*, 697 N.E.2d 667, 677 (Ohio Ct. App. 1997). Stretching the counterclaim to assert a claim for fraud absent intent—so as to implicate coverage—stretches the allegations in JKD's counterclaim too far.

Jewelers Mutual did not breach the contract or act in bad faith when it refused to defend.  These other claims were properly dismissed.

**IV**

The Policy does not impose a duty of defense upon Jewelers Mutual, and accordingly, all of Stafford's claims are without merit.  The district court's judgment is affirmed.